STOEHR, SUING IN HIS OWN BEHALF AS A STOCKHOLDER IN STOEHR & SONS, INC., ETC. *v.* WALLACE ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 546.   Argued January 4, 5, 1921.—Decided February 28, 1921.

1. The Trading With the Enemy Act, originally and as amended, is strictly a war measure, and finds its sanction in the provision empowering Congress "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water." Const. Art. I, § 8, cl. 11.  P. 241.

2. Under § 7c of the act, as qualified by § 5, the power vested in the President to determine enemy ownership, precedent to a seizure of property, may be delegated by him to the Alien Property Custodian, whose determination then becomes in effect the act of the President. P. 244.

3. The provision made for *ex parte* executive seizure, without prior judicial determination of enemy ownership, does not violate the rights of the owner, if a citizen, under the due process clause of the Fifth Amendment, since ample provision is also made whereby any claimant who is neither an enemy nor an ally of an enemy may establish his right in a court of equity and compel a return of the property if wrongly sequestered.  P. 245.

4. A transfer of shares upon the books of the corporation to the name of the Custodian is a proper incident to their effective seizure by him.  P. 246.

5. A contract between a German corporation and a New York corporation, made in anticipation of this country's entry into the World War, whereby certain corporate shares in another domestic corporation, owned by the German corporation, were in purport sold to the New York corporation and were transferred to the latter on the books of the third company, not as a genuine business transaction but as a mere cover to avoid inconveniences of a state of war and with no intent to change the beneficial ownership, *held* not to have passed any interest entitling the New York corporation, or a stockholder asserting its rights, to demand release of such shares from seizure by the Alien Property Custodian.  Pp. 246–251.

6. The provisions of the Treaty with Prussia of July 11, 1799, Arts. 23, 24, 8 Stat. 174, granting rights to the merchants of either country "residing in the other," when war arises, *held* inapplicable. P. 251.

7. Objection to a proposed sale by the Alien Property Custodian cannot be heard from one who has no interest in the property. *Id.*

269 Fed. Rep. 827, affirmed.

THE case is stated in the opinion.

*Mr. Louis Marshall,* with whom *Mr. Louis J. Vorhaus* was on the brief, for appellant.

*The Solicitor General* and *Mr. George L. Ingraham* for Francis P. Garvan, individually and as Alien Property Custodian, appellee.

*Mr. John Quinn,* with whom *Mr. Paul Kieffer* was on the brief, for Botany Worsted Mills and its directors, and Stoehr & Sons, Inc., and its directors, appellees.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a suit to establish a claim to and prevent a sale of 14,900 shares of the capital stock of the Botany Worsted Mills, a New Jersey corporation, which were seized by the Alien Property Custodian under the Trading with the Enemy Act as the property of a German corporation called Kammgarnspinnerei Stoehr & Co., Aktiengesellschaft. The plaintiff is a citizen of the United States, residing in New York, and sues in the right of Stoehr & Sons, Inc., a New York corporation, of which he is a stockholder, his asserted justification for so suing being that the directors of the corporation are agents of the Alien Property Custodian and so far under his control that it would be useless to request them to bring the suit.

The grounds for relief urged in the bill are that the shares, although seized and proposed to be sold as the

property of the German corporation, are in truth the property of the New York corporation; that, even if it does not own them, it has a substantial interest in them under a pre-war contract between it and the German corporation; that the shares cannot be taken from it consistently with due process of law as guaranteed by the Fifth Amendment, save through a judicial proceeding wherein it has a right and an opportunity to be heard; that the shares were seized and are about to be sold without any such proceeding or hearing, and in violation of subsisting treaty provisions; and that the seizure as made did not conform to designated provisions of the Trading with the Enemy Act, and the sale as proposed will not be in accord with other provisions of the act.

After a full hearing the District Court overruled the objections urged against the initial seizure; found from the proofs that the German corporation was the beneficial owner that the New York corporation had no actual interest in the shares, and that the contract between those corporations, stressed by the plaintiff, "was not intended to represent the real purpose of the parties at all, but to serve as a cover for another purpose"; and as a result of the findings the court held that neither the plaintiff nor his corporation was entitled to any relief, and accordingly dismissed the bill. The plaintiff then asked and was allowed a direct appeal to this court. His assignments of error cover all the grounds on which the seizure and proposed sale were attacked in the bill.

We shall assume, as did the District Court, that a stockholder may bring a suit such as this in the right of his corporation, where there are circumstances justifying such representative action, and that the plaintiff has shown sufficient reason for suing in that capacity. See Eq. Rule 27, 226 U. S., Appendix, p. 8.

The Trading with the Enemy Act, whether taken as originally enacted, October 6, 1917, c. 106, 40 Stat. 411,

or as since amended, March 28, 1918, c. 28, 40 Stat. 459, 460; November 4, 1918, c. 201, 40 Stat. 1020; July 11, 1919, c. 6, 41 Stat. 35; June 5, 1920, c. 241, 41 Stat. 977, is strictly a war measure and finds its sanction in the constitutional provision, Art. I, § 8, cl. 11, empowering Congress "to declare war, grant letters of marque and reprisal, and make rules concerning captures on land and water." *Brown* v. *United States,* 8 Cranch, 110, 126; *Miller* v. *United States,* 11 Wall. 268, 305.

.It is with parts of the act which relate to captures on land that we now are concerned. They invest the President with extensive powers respecting the sequestration, custody and disposal of enemy property. By § 5 he is in terms authorized to exercise "any" of these powers "through such officer or officers as he shall direct." By § 6 he is authorized to appoint and "prescribe the duties of" an officer to be known as the Alien Property Custodian. By § 7c, as amended November 4, 1918, direct provision for sequestering enemy property is made as follows:

"If the President shall so require any money or other property including . . . choses in action, and rights and claims of every character and description owing or belonging to or held for, by, on account of, or on behalf of, or for the benefit of, an enemy or ally of enemy not holding a license granted by the President hereunder, which the President after investigation shall determine is so owing or so belongs or is so held, shall be conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or the same may be seized by the Alien Property Custodian; and all property thus acquired shall be held, administered and disposed of as elsewhere provided in this Act.

\*    \*    \*    \*    \*    \*    \*    \*

"Whenever any such property shall consist of shares of stock or other beneficial interest in any corporation,

association, or company or trust, it shall be the duty of
the corporation, association, or company or trustee or
trustees issuing such shares or any certificates or other
instruments representing the same or any other beneficial
interest to cancel upon its, his, or their books all shares
of stock or other beneficial interest standing upon its, his,
or their books in the name of any person or persons, or
held for, on account of, or on behalf of, or for the benefit
of any person or persons who shall have been determined
by the President, after investigation, to be an enemy or
ally of enemy, and which shall have been required to be
conveyed, transferred, assigned, or delivered to the Alien
Property Custodian or seized by him, and in lieu thereof
to issue certificates or other instruments for such shares
or other beneficial interest to the Alien Property Cus-
todian or otherwise, as the Alien Property Custodian
shall require.

"The sole relief and remedy of any person having any
claim to any money or other property heretofore or here-
after conveyed, transferred, assigned, delivered, or paid
over to the Alien Property Custodian, or required so to be,
or seized by him shall be that provided by the terms of
this Act, and in the event of sale or other disposition of
such property by the Alien Property Custodian, shall be
limited to and enforced against the net proceeds received
therefrom and held by the Alien Property Custodian or
by the Treasurer of the United States."

By § 9, as twice amended, any one, "not an enemy or
ally of enemy," claiming any interest, right or title in
any money or other property so sequestered and held
may give notice of his claim and institute a suit in equity
against the Custodian or the Treasurer, as the case may
be, to establish and enforce his claim; and where suit is
brought the money or property is to be retained by the
Custodian or in the Treasury to abide the final decree.
By § 12, as amended March 28, 1918, the Custodian is

clothed with "all of the powers of a common-law trustee"
in respect of all enemy property coming into his hands and
is given authority, subject to the President's supervision,
to manage and dispose of the same, by sale or otherwise,
as if he were the absolute owner, save as the power of
disposal may be suspended by a suit under § 9. As re-
spects the ultimate disposition of the property or its pro-
ceeds § 12 says: "After the end of the war any claim of
an enemy or of an ally of enemy to any money or other
property received and held by the alien property custodian
or deposited in the United States Treasury, shall be settled
as Congress shall direct."

The President, by orders of October 12, 1917, and
February 26, 1918, committed to the Alien Property
Custodian the executive administration of § 7c, including
the power to determine after investigation whether prop-
erty was enemy-owned, etc., and to require the surrender
or seizure of such as he should determine was so owned.
In exercising this power the Custodian after investigation
determined, in substance, that the shares now in question,
which then stood in the name of the New York corporation
on the books of the Botany Worsted Mills, belonged to
the German corporation, that it was an enemy not hold-
ing a Presidential license, and that the New York cor-
poration held the shares for its benefit; and in further
exercising this power the Custodian seized the shares and
required the Botany Worsted Mills to transfer them to
his name on its books in accordance with the provision
in § 7c before quoted.

One objection urged by the plaintiff is that the seizure
permitted by the act is confined to money or property
"which the President after investigation shall determine "
is enemy-owned, etc., and that here there was no such
determinatior by the President, but only by the Custodian.
Whether the objection would be good if it turned entirely
on the words of § 7c, on which the plaintiff relies, we need

not consider; for they obviously are qualified and explained by § 5, which very plainly enables the President to exercise his power under § 7c "through such officer or officers as he shall direct." By the orders already noticed the President directed that this power be exercised through the Alien Property Custodian. It therefore is as if the words relied on had been "which the President, acting through the Alien Property Custodian, shall determine after investigation" is enemy-owned, etc. In short, a personal determination by the President is not required; he may act through the Custodian, and a determination by the latter is in effect the act of the President. *Central Union Trust Co.* v. *Garvan,* 254 U. S. 554; *The Confiscation Cases,* 20 Wall. 92, 109.

The plaintiff further objects that the shares, although claimed by and standing in the name of the New York corporation, which concededly was neither an enemy nor an ally of an enemy, were seized and transferred to the name of the Alien Property Custodian in virtue of a determination by an executive officer in an *ex parte* administrative proceeding that they belonged to an alien enemy, —the gist of the objection being that the shares could not be taken from the New York corporation consistently with due process of law without first according it a hearing on its claim in a court of justice. The objection rests on erroneous assumptions and is not tenable.

That Congress in time of war may authorize and provide for the seizure and sequestration through executive channels of property believed to be enemy-owned, if adequate provision be made for a return in case of mistake, is not debatable. *Central Union Trust Co.* v. *Garvan, supra.* There is no warrant for saying that the enemy ownership must be determined judicially before the property can be seized; and the practice has been the other way. The present act commits the determination of that question to the President, or the representative through whom

he acts, but it does not make his action final. On the contrary, it distinctly reserves to any claimant who is neither an enemy nor an ally of an enemy a right to assert and establish his claim by a suit in equity unembarrassed by the precedent executive determination. Not only so, but pending the suit, which the claimant may bring as promptly after the seizure as he chooses, the property is to be retained by the Custodian to abide the result and, if the claimant prevails, is to be forthwith returned to him. Thus there is provision for the return of property mistakenly sequestered; and we have no hesitation in pronouncing it adequate, for it enables the claimant, as of right, to obtain a full hearing on his claim in a court having power to enforce it if found meritorious.

That the shares were transferred to the Custodian's name does not affect the question, for, considering the nature of the property, that was but an incident of an effective seizure and, if a return of the shares were ordered, a re-transfer would follow as of course.

Treating this as a suit under § 9,—the plaintiff having filed a notice of claim under that section,—the next question is, has the New York corporation such an interest in the shares as entitles it, or the plaintiff in its right, to demand that they be freed from the seizure. Whether it has any interest turns on the effect to be given to the contract between it and the German corporation, under which the plaintiff insists it became the owner or acquired a substantial interest. The District Court, as we have indicated, found that the contract was not intended to affect the ownership as between the two corporations, but to serve as a cover for something else, and that after the contract the German corporation remained, as it had been before, the sole beneficial owner. The facts bearing on the question are as follows:

At the beginning of the World War and during its early stages the Stoehr family, consisting of a father and three

sons, were engaged in business in New York as copartners
under the name of Stoehr & Sons. The father and one
son were German subjects residing in Germany; one son,
Hans E. Stoehr, was a German subject residing in the
United States, and the remaining son, Max W. Stoehr,
was a naturalized citizen of the United States residing
therein. All were shareholders in the German corporation
and the father and son in Germany were among its chief
officers. All were directors of the Botany Worsted Mills,
and Hans E. Stoehr and Max W. Stoehr were directing
and controlling its affairs, one being its treasurer and the
other its secretary. It was a manufacturing concern with
large holdings, had a well-established and extensive busi-
ness, had been paying large dividends and gave promise
of continuing to do so. The German corporation acquired
the 14,900 shares in that company long prior to the war,
and in 1915, after the war became flagrant in Europe,
transferred them to Hans E. Stoehr and Max W. Stoehr
to be held in trust for it as the beneficial owner. Stoehr
& Sons, the copartnership, also had 5,690 shares in that
company, and these with the 14,900 constituted a majority
of its stock.

Diplomatic relations between the United States and
Germany were severed February 3, 1917, and, as was
commonly understood, war between them was then im-
minent. The Stoehrs took that view and began to adjust
their affairs accordingly. They caused the New York
corporation to be organized, and on February 19, 1917,
transferred to it the entire assets and business of their
copartnership, taking in exchange all of its capital stock
and putting the same in a five-year voting trust as a means
of protecting and preventing a severance of their interests.
On the following day, February 20, 1917, the contract
relating to the 14,900 shares in the Botany Worsted Mills
was made and the shares were immediately transferred
on its books to the name of the New York corporation.

In that transaction Hans E. Stoehr acted for the German corporation and the directors of the New York corporation for it,—the directors being Hans E. Stoehr, Max W. Stoehr, George G. Roehlig and Alfred de Liagre, the last two being relatives of the Stoehrs. The attorney who had advised and assisted them in transferring the copartnership assets and business also advised and assisted them in this. The shares were worth approximately $5,000,000; and yet the initial payment was only $5,000, and even that was paid by mere book entries. The full stipulated price was the book value of the shares, with good will and other intangible assets eliminated, and was payable in five future annual instalments. The stock certificates, transferred as just stated, were left in the custody of the German corporation as collateral security. If payment was not made when due, nor within sixty days after demand, the shares were to be re-transferred, the $5,000 was to be retained by the German corporation and neither corporation was to have "any further claim against the other" by reason of the contract. Possibly the stipulated price was less than the actual value; but, however this may have been, the assets and situation of the New York corporation were such that it reasonably could not have been expected to make the required payments.

After the contract the dividends accruing on the shares were not paid to the New York corporation, but were credited to it in a "special" account on the books of the Botany Worsted Mills, this being directed by Hans E. Stoehr, president of the former and treasurer of the latter.

War was declared by Congress April 6, 1917, 40 Stat. 1; and the Trading with the Enemy Act was passed October 6th following. Up to the latter date no preparation was made for making the first payment under the contract although it was to be about $1,000,000. Under the act it became the duty of every domestic corporation to report fully whether it owed any money to or held any property

for an enemy, and also whether any of its shares were owned by or held for an enemy. In the report of the New York corporation, signed by Max W. Stoehr, the 14,900 shares covered by the contract were not reported as held for the German corporation, nor was the stipulated price or any part thereof reported as owing to that corporation. But in the report of the Botany Worsted Mills, signed by Thomas Prehn, it was said that that company had "reason to believe" that the German corporation had an interest in the shares. This led to an insistent call for full informa- tion and resulted in some correspondence and several conferences at the Alien Property Custodian's office, in all of which Herbert Heyn represented the New York corpo- ration and the Botany Worsted Mills,—he being the attor- ney who had advised and assisted the Stoehrs in adjusting their copartnership affairs and in making the contract. February 5, 1918, while Heyn was attending one of the conferences, Hans E. Stoehr, as president of the New York corporation and treasurer of the Botany Worsted Mills, sent to him, for use at the conference, a list of the latter company's stockholders, in which the German corporation was described as having 14,900 shares and the New York corporation as having only 5,685. In an accom- panying letter he said, "the majority of the stock of the Botany Worsted Mills . . . is held by parties who are alien enemies,"—a statement which was true if the 14,900 shares belonged to the German corporation, and not true if they belonged to the New York corporation. Four days later Heyn, with the approval in writing of Hans E. Stoehr as such president and treasurer, wrote to the Alien Prop- erty Custodian, saying of the purpose with which the New York corporation was formed: "The immediate occasion for the organization of the corporation in February, 1917, was this: It was assumed that if there was a declaration of war between the United States and Germany, the partner- ship [of Stoehr & Sons] would probably have to cease,

being dissolved by reason of the alien enemy character.of Eduard Stoehr, the father, and Geo. Stoehr, the brother, the results of such dissolution being of course obviously unfortunate and conceivably disastrous"; and saying of the 14,900 shares: "Regarding the contract for the purchase of said 14,900 shares by Stoehr & Sons, Inc., from Stoehr & Co., of Leipzig, Germany, it has been fully explained that the control of Botany might be imperiled by a state of war, because the voting right on stock of alien enemies or in which alien enemies had the beneficial interests (as was the case with said 14,900 shares) was doubtful under the decisions of the courts, and if deprived of the voting right, the control of Botany might be lost. This contract was made with reference to the control of Botany as between its stockholders and had of course no reference to the status of such control so far as the Alien Property Custodian is concerned. Such status is not affected whether such shares are in Stoehr & Co., the Leipzig corporation, or in Stoehr & Sons, Inc., the New York corporation. . . . While Botany is managed in this country, considerably more than a majority of its stock is controlled by alien enemy interests."

Max W. Stoehr, the plaintiff, was a director and the secretary of the New York corporation from the time it was organized until October 14, 1918. He participated in making the contract relating to the 14,900 shares and signed it as secretary. The shares were seized in April, 1918, and he knew of the seizure. The other directors at that time were new. He regularly attended their meetings, but did not suggest to them that the corporation had an interest in the shares. At a meeting in August, 1918, an attorney who had been looking into the contract made an oral report, in the course of which he called in question the purpose with which the contract was made and said it "would not hold water." Max W. Stoehr, although present, said nothing in support of the contract. Not until he

ceased to be an officer of the corporation did he manifest any opposition to the seizure. His only explanation of his silence while he remained a director is that he feared he would lose that position if he took any other course.

The District Court, after reviewing the proofs at length, concluded that the contract was not prompted by commercial motives, nor based on an estimate of mutual advantages, and was not intended as a genuine business transaction, but was made to avoid inconveniences which otherwise might ensue from a state of war; and that the parties intended to leave the beneficial ownership in the German corporation and not to pass it to the New York corporation. We reach the same conclusion. On no other theory can the acts of those who were concerned be explained or their declarations reconciled. The mere recitation of the facts makes this so plain that we refrain from any special discussion of them.

The treaty provisions relied on (Articles 23 and 24, 8 Stat. 174) relate only to the rights of merchants of either country "residing in the other" when war arises, and therefore are without present application.

Of the objections specially directed against the proposed sale, it is enough to observe that as the New York corporation does not own or have any interest in the shares it is not in a position to criticize or attack the sale; and of course a stockholder suing in its right is in no better position.

*Decree affirmed.*