## STANDARD OIL CO. (NEW JERSEY) et al. v. MARKHAM, Alien Property Custodian.

District Court, S. D New York.

Sept. 5, 1944.

Kenyon & Kenyon, of New York City
(John W. Davis, Theodore S. Kenyon,
Edward F. Johnson, and Edgar F. Baum-
gartner, all of New York City, of counsel),
for plaintiffs.

James B. M. McNally, U. S. Atty., of
New York City (William L. Lynch, Asst.
U. S. Atty., of New York City, Herbert
Wechsler, Asst. Atty. Gen., George A. Mc-
Nulty, Chief, Alien Property Unit, of
Washington, D. C., Philip W. Amram, Sp.
Asst. to Atty. Gen., David R. Mason, M.
S. Isenbergh, Chief, Trial Atty., and Roy
C. Frank, Head Atty., all of Washington,
D. C., and John Ernest Roe, Gen. Coun-
sel, Alien Property Custodian, of Madison,
Wis., of counsel), for defendant.

KNOX, District Judge.

Plaintiffs have brought suit against the
Alien Property Custodian pursuant to the
provisions of Section 9(a) of the Trading
with the Enemy Act of October 6, 1917, as
amended, 50 U.S.C.A.Appendix § 9(a), to
establish their alleged ownership to certain
contracts, corporate stock, patents, and
other property rights which, upon the Cus-
todian's demand for their possession, he
vested in himself under the terms of Vest-
ing Order No. 1, dated March 25, 1942; and
of another order of May 23, 1944, desig-
nated as Supplemental Order 1 to Vesting
Order No. 1. The basis of these orders
was the Custodian's findings that the prop-
erty in question belongs to I. G. Farbenin-
dustrie, A. G., a German National.

Supplemental Order No. 1 required that
the parties in control and possession of the
property should assign, transfer and deliver
the same to the Custodian, and this plain-
tiffs did. For the further protection of his
rights, the Custodian filed each of the above
mentioned orders in the United States Pat-
ent Office. Furthermore, he caused the word
"Vested" to be stamped on the pending pat-
ent applications in dispute; has had the
Patent Office issue allowed patents to him-
self, has catalogued the same, and he now
proposes to grant licenses under such pat-
ents to such persons as may apply to him to
make use of the inventions disclosed
therein.

Pending a determination of the merits of
plaintiffs' suit against the Custodian, they
ask that he be restrained—

(a) From disposing, or offering to dis-
pose of all or any of the property;

(b) From granting, or offering to grant
any licenses under any of the patent rights;
and

(c) From interfering in any way with
the granting of licenses by the plaintiff, or
any of them, under said patent rights.

At this point, it should be stated that, on
March 25, 1942, the United States District
Court for the District of New Jersey en-
tered a consent decree in an anti-trust suit
that had there been begun by the Govern-
ment against the plaintiffs here, and certain
other defendants. Immediately prior to the
entry of the aforesaid decree, the Custodian
had issued Vesting Order No. 1, and by vir-
tue thereof, he was permitted to intervene
in the action, and became bound by the
decree.

After granting injunctive relief that ap-
peared to be required, the District Court
in New Jersey proceeded to allocate the
property rights involved among corporate
defendants in the manner set forth in the
decree, and to this allocation the litigants
and the Custodian gave assent. Thereafter,
on April 7, 1943, the same Court, again on
consent of all parties, entered a supple-
mental judgment.

Following the issuance of the Custodian's
Supplemental Order No. 1, the present

plaintiffs proceeded to assert their claims to the property rights affected thereby, and electing not to ask relief from the President, instituted this suit to repossess the property in controversy. The statute, when suit is brought to recover property seized by the Custodian, requires him to retain the same, pending a judicial determination of the merits of the issues. But plaintiffs allege that the Custodian, in defiance of the statutory mandate resting upon him, and in derogation of their rights, and to their detriment, is about to grant licenses under the patents to persons and corporations of his own selection. Their contention is that, any licenses so granted will pro tanto be a disposition or destruction of the property rights evidenced by the patents.

The Custodian, on the other hand, says that the action he has in mind is wholly justifiable, and will be of no injury to the plaintiffs. He proceeds to argue that plaintiffs, under Section 9(a) of the statute, whatever may be the result of what he proposes to do, are not entitled to injunctive relief. In other words, his position is that the United States has not consented that one of its courts may issue an injunction to restrain him from taking the threatened action. It follows that the matter of the Court's jurisdiction must first be decided.

■ That the instant suit, in substance, is one directed against the sovereign may be conceded. Banco Mexicano v. Deutsche Bank, 263 U.S. 591, 603, 44 S.Ct. 209, 68 L.Ed. 465; Synthetic Patents Co. v. Sutherland, 2 Cir., 22 F.2d 491; Cummings v. Deutsche Bank, 300 U.S. 115, 57 S.Ct. 359, 81 L.Ed. 545. It is also true that Section 7(c) of the statute, as amended, 50 U.S.C.A. Appendix § 7(c), provides that:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter * * * transferred * * * or paid over to the Alien Property Custodian * * * shall be that provided by the terms of this Act, and in the event of sale or other disposition of such property by the Alien Property Custodian, shall be limited to and enforced against the net proceeds received therefrom and held by the * * * Custodian * * *."

Section 9(f) further provides:

"Except as herein provided, the money or other property conveyed * * * or paid to the * * * Custodian, shall not be liable to lien, attachment, garnishment, trustee process, or execution, or subject to any order or decree of any court."

These sections of the law, I am persuaded, have primarily to do with situations that arise when the Custodian has made disposition of seized property prior to the time at which a claimant, under the privilege given by 9(a) institutes suit against the Custodian for the purpose of reacquiring his property.

■ That this is so appears reasonably clear from decisions of the Supreme Court in Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; Stoehr v. Wallace, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604. The existence of a right upon the part of claimant to regain his wrongfully seized property, and to do so completely, is essential to the constitutionality of the Act. If, as was held in Henkels v. Sutherland, 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed 953, a claimant may recover interest earned on funds that were mistakenly taken by the Custodian, and if further, as decided in Escher v. Woods, 281 U.S. 379, 50 S.Ct. 337, 74 L.Ed. 918, the proper costs of administration of such funds are not to be chargeable against such funds, it is obvious that, under some conditions, Section 7(c) and 9(f), are not wholly applicable.

As was said by Mr. Justice Stone in Becker Steel Co. v. Cummings, 296 U.S. 74, 56 S.Ct. 15, 18, 80 L.Ed. 54:

"Plainly inadequate would be a remedy which could be availed of only while the Custodian or Treasurer continues to retain possession of the seized property or its proceeds, and which would be lost whenever he disposed of the property and proceeds, whether lawfully or not. * * *"

"Section 9(a) must be broadly construed to give effect to its remedial purpose."

So, here, plaintiffs' rights would be largely imaginary, if the Custodian, contrary to his statutory obligation to retain the whole of their property, until final judgment and decree, were ruthlessly, bit by bit, to fritter it away, and in a manner of his own choice.

■ Should any such conduct be threatened, or be in the Custodian's contemplation, I have no doubt that the Court in which a recovery action has been begun would have full power, and be under a compelling duty, by way of coercion upon the Custodian, to preserve the property intact. Draeger Shipping Co. v. Crowley, D.C., 49

F.Supp. 215; Duisberg v. Crowley, D.C., 54 F.Supp. 365; and Stoehr v. Wallace, 2 Cir., 269 F. 827, affirmed 255 U.S. 239, 246, 41 S.Ct. 293, 65 L.Ed. 604.

Having concluded that the Court is authorized, upon a proper showing, to protect and preserve the integrity of property wrongfully taken from its lawful owner, it remains to be seen whether plaintiffs have convincingly shown their property is in jeopardy. And this requires a consideration of the decree issued by the United States Court of the District of New Jersey on March 24, 1942.

Under the terms of that judgment, the defendants then before the court, among which were the present plaintiffs, were directed to transfer certain designated patents to Standard Catalytic Company or to Jasco, Incorporated, together with a right upon the part of these corporations to grant licenses or sublicenses under other patents held by the Standard Oil Company (New Jersey). The defendants were then directed:

"To issue licenses or sublicenses on these patents, or to direct or compel the licensing agency to do so, on the request of any person or corporation, without restriction as to the technique to be employed or as to the use to be made of such patents, or as to the price to be charged for any of the products manufactured under such licenses or sublicenses, and without any other restriction whatsoever, save that reasonable royalty rates may be charged under said licenses or sublicenses in connection with operations after the present emergency for the duration of which said licenses or sublicenses shall be royalty free."

Similar directions were given to both Standard Oil Company (New Jersey) and to Standard Oil Development Company. The defendants (in the anti-trust suit) were to be free at any time to receive a reasonable compensation from licenses and for the supply of "know-how" furnished, in accordance with * * * paragraph 6 of the decree, with all licenses under Butyl patents.

Paragraph 6 reads:

"To furnish with all licenses issued under paragraph (5) above know how without compensation therefor, save that the cost of furnishing know-how may be recovered from the licensee, which cost shall include the value of time spent by defendants' personnel in furnishing said know how, and save that a reasonable compensation may be received for know-how furnished with licenses under Butyl patents."

Generally speaking, all that should thereafter be done with respect to the patents, including costs, charges and royalty rates were to be reported to the Attorney General of the United States or to one of his assistants and, in a sense, therefore, the acts of all the defendants are under the official supervision of the Chief Law Officer of the Government, and he, presumably will ever be ready to take such action in the premises as may become necessary or appropriate.

From the foregoing, it is seen that the present plaintiffs now labor under definite and specific restraints as to what, under existing circumstances they can or may do with respect to the patents in suit. Instead of possessing full and exclusive rights and privileges to exclude others than themselves from practising the teaching of the patents, their liberty of action has been curtailed, and they must, under compulsion, permit such practices by others than themselves.

With these facts in view, it is necessary to see also, what it is that the Custodian proposes to do.

In his affidavit of August 8, 1944, filed in opposition to plaintiffs' motion for injunctive relief, he says, in effect:

"That he recognizes and at all times since March 25, 1942, has recognized that Standard Catalytic Company and Jasco, Incorporated, are authorized to act as non-exclusive licensing agents for the Alien Property Custodian for the purpose of granting licenses in accordance with the terms of the decree of March 25, 1942, under patents and patent rights vested in the Alien Property Custodian and subject to the compulsory licensing provisions thereof, and that, prior to the institution of the present suit, the plaintiffs were so advised.

"He also sets forth a statement of his present licensing policy which is—

"(A) with respect to those patents and patent rights, which the decree requires to be licensed without restriction, save that reasonable royalty rates may be charged in connection with operations after the present emergency, as defined in the decree, he will offer licenses providing for no royalties during such emergency and for reasonable royalties thereafter, provided, however, that in the event a determination of reason-

able royalties is made pursuant to Section IV(9) of the decree, he will make such adjustment, if any, as may be necessary to bring the royalty rates set by him into harmony with such determination.

"(B) With respect to patents and patent rights which the decree requires to be licensed, and for which reasonable royalty rates may be charged during the present emergency he will, subject to the possibility of judicial determination under the decree, offer licenses providing for reasonable royalties.

"(C) All such licenses will be offered for the life of the patents, each license, however, providing for termination with respect to any patent or patent rights in the event of the establishment of an interest therein adverse to the Custodian and providing further for such revision of terms as may be necessary in accordance with the provisos to Items A and B as set forth above.

"(D) The Custodian will hold in a special fund all royalties collected during the pendency of the present action."

Defendant further says that plaintiffs cannot properly take exception to such official action as was taken by him prior to the institution of this suit inasmuch as, under the statute, he was empowered to make such disposition of property vested in him as, in his judgment, the public interest required, and this statement finds support in Sielcken-Schwarz v. American Factors, Ltd., 2 Cir., 60 F.2d 43, certiorari denied 287 U.S. 654, 53 S.Ct. 117, 77 L.Ed. 565.

This being so, all that now remains for decision is to determine whether the proposed future action of the Custodian will invade any rights that Section 9(a) confers upon the plaintiffs. He categorically affirms that his previous licensing policy will no longer be followed; that pamphlets and notices heretofore issued setting forth his licensing policy and attached to plaintiffs' supporting affidavits, are no longer effective, and that his future policy will be as set forth in his affidavit. From this it plainly appears that the Custodian intends to do nothing with the patents and patent rights that the plaintiffs themselves are not bound to do under the decree of March 25, 1942. It is assumed, of course, that the Custodian will not do otherwise than he says. But, should he proceed to depart from the policy he has outlined, this Court and possibly the one that made the decree of March 25, 1942, can exercise jurisdiction over him, and on a proper showing of injury to plaintiffs, or threat thereof, they can ask for such protection as may be needed.

If it be that persons seeking licenses under the patents can procure better terms by dealing with plaintiffs in that they can furnish "know-how," which the Custodian cannot, it is reasonable to suppose that potential licensee will take advantage of the more attractive bargain. As a result, the contention made by plaintiffs with respect to "know-how" is of little moment.

In summary, it may be said that if plaintiffs were themselves free agents, and possessed of an ability to deal with the patents in a manner that best suits them, their complaint would be well founded. But such is not the present situation. Their patents, in a limited and special sense, are in the public domain, and, since the defendant proposes to do nothing that the plaintiffs themselves are not required to do, I see no good reason, pending a determination of title to the patents, why one side as against the other, should gain an advantage, fancied or real, by being exclusively permitted to exercise dominion over the property.

Plaintiffs' motion for a preliminary injunction is denied.