**BROWNELL, Atty. Gen.**

v.

**KETCHAM WIRE & MFG. CO.**

**No. 13718.**

United States Court of Appeals
Ninth Circuit.

Feb. 19, 1954.

**JAMES M. CARTER**, District Judge.

This appeal raises questions concerning the jurisdiction of the District Court under the Trading With The Enemy Act, Oct. 6, 1917, c. 106, § 1; 40 Stat. 411 as amended; 50 U.S.C.A.Appendix, §§ 1–40; interpretation of appellee's patent licensing contract with a German national and the impact of the antitrust laws of the United States on such contract.

Motions for summary judgment supported by affidavits were made by both appellant and appellee, and the basic facts are not in dispute. No findings were made. We draw the facts hereafter related from the admitted facts of the pleadings, the undisputed affidavits, and correspondence between the parties set up as exhibits to the motions.

The appellee and plaintiff [hereafter called Ketcham] is a corporation of the State of Washington. It is not an "enemy" or "ally of the enemy." On December 23, 1938, there was delivered to Ketcham an option agreement executed by Oscar Kind, a German national, covering two U. S. patents, and two applications for U. S. patents relating to wire tieing and wire strapping methods, devices and machines.[1] The patents in question were the product of German invention, and owned by Oscar Kind.[2]

Ketcham paid $1000 to Kind on receipt of the option, and within the time specified and an extension thereof, paid an additional $4000 on or about June 30, 1939. Ketcham thus secured an exclusive licensing agreement covering the patents and patent applications [hereinafter referred to as the "patents"] within the United States and its territories.

In return for the exclusive license, Ketcham was obligated to pay royalties based on the amount of wire sold with

Paul V. Myron, Deputy Director, Office of Alien Property, Washington, D. C., James D. Hill, George B. Searls, Westley W. Silvian, Attorneys, Department of Justice, Washington, D. C., Charles P. Moriarty, U. S. Atty., Seattle, Wash., John E. Belcher, Asst. U. S. Atty., Seattle, Wash., Val Hammack, Sp. Asst. to Atty. Gen., for appellant.

Skeel, McKelvy, Henke, Evenson & Uhlmann, W. Paul Uhlmann, William H. Gates, Jr., Altha P. Curry, Seattle, Wash., for appellee.

Before HEALY and BONE, Circuit Judges, and JAMES M. CARTER, District Judge.

1. Those patents were No. 2,019,570—wire strapping for packages, with twisted tie, issued November 5, 1935; No. 2,129,063 wire tieing machine etc., issued September 6, 1938. Application, Serial No. 144,-101, devise for tensioning metal binding strips, on which patent No. 2,154,851 was issued on April 18, 1939; and patent application Serial No. 277,561 for a full automatic wire strapping machine on which patent No. 2,330,629 was issued on September 28, 1943.

2. There was undisputed evidence in the record from which the trial court could and did hold that Kind was the owner of the patents, although title to one of them stood in the name of a German Company, owned and controlled by Kind.

the inventions covered by the licensing agreement, and on the sale of machines manufactured under the patents. Royalty provisions also gave the licensor, Kind, the right to cancel in the event that sales did not produce $2000 royalty per year within two years. Kind promised, among other things, to supply Ketcham with plans and specifications and a sample of an automatic wire tieing machine. Due to the intervention of the war, this machine and the plans and specifications were never delivered to Ketcham.

After describing the patents, the agreement read as follows: "I, [Kind], offer you the sole and exclusive right to manufacture, sell, loan, give in sub-license or dispose of otherwise in the United States and its territories and possessions, the articles covered by said patents and applications for patents, and all improvements thereon at the following conditions * * * "; and provided in paragraph 12, "It is understood and agreed that you will not sell or export the articles covered by the aforesaid patents and patent applications to any foreign country, and that I will not import nor permit the importation of said articles into the United States of America, its territories and possessions."

The patents were vested [3] by the Alien Property Custodian by vesting orders No. 68 and No. 201 [7 Fed.Reg. 6181, 8 Fed.Reg. 625], dated respectively July 30, 1942 and October 2, 1942. All right, title and interest of Kind in the license agreement was vested by the Alien Property Custodian by vesting order No. 3998 [9 Fed.Reg. 10652] on August 8, 1944.

Pursuant to inquiry by Ketcham, the Alien Property Custodian on November 5, 1942, enclosed copies of two forms which could be filed with his office— Form APC–1, issued pursuant to General Order No. 4, [Fed.Reg. 5539] and Form APC–2, issued pursuant to General Order No. 2, [7 Fed.Reg. 4634.]

On November 5, 1942, the Alien Property Custodian also informed Ketcham that the Custodian was willing to consider an informal claim to any rights it might have and that if action satisfactory to Ketcham was not taken, Ketcham could then file a claim on APC–1. On December 1, 1942, Ketcham filed form APC–2. The government [4] contends Ketcham never filed form APC–1.

By letter of July 1, 1949, the government advised Ketcham that it had concluded that the licensing agreement violated the Sherman Act, 15 U.S.C.A. § 1 et seq., that rights claimed by appellee under the licensing agreement were unenforcible and that the government considered itself "at liberty to take such action with respect to the patents as appear to be desirable in the public interest, including the grant of revocable, non-exclusive, royalty free licenses thereunder."

On September 20, 1950, the government informed Ketcham of its intention to terminate the agreement as of December 31, 1950, for failure to pay the minimum royalties provided for in the agreement.

This action was commenced November 27, 1950, before the date of the announced termination.

3. During World War I the Custodian "seized" property. By virtue of the 1941 amendment to the Act, during World War II property was "vested". Section 9(a) applies to "vested" property as it did to that which was "seized". See Markham v. Cabell, 1945, 326 U.S. 404, 411, 66 S. Ct. 193, 90 L.Ed. 165; Draeger Shipping Co. v. Crowley, D.C., S.D.N.Y.1943, 49 F.Supp. 215.

4. The vesting orders were made by the Alien Property Custodian. Subsequently the record shows action by the "Office of Alien Property" and "Director, Office of Alien Property." By Executive Order No. 9788, 50 U.S.C.A.Appendix, § 6 note [Oct. 15, 1946, 11 Fed.Reg. 11981] the Attorney General succeeded to the duties and powers of the Alien Property Custodian. In this opinion the Alien Property Custodian, the Director, Office of Alien Property and the Attorney General will be referred to as the government.

Upon granting Ketcham's motion for summary judgment, the district court entered a judgment which we summarize as follows:

(1) That the agreement between Kind and Ketcham was an enforcible agreement, had not been abandoned or terminated by the parties, and was still in force and effect.

(2) That the agreement did not violate the antitrust laws of the United States. That if paragraph 12 of the agreement could be said to violate the antitrust laws, the paragraph was severable from the rest of the agreement and the lawful parts would be given effect.

(3) That forfeiture or termination of the agreement for failure to pay minimum royalties could be effected by the licensor or his successors in interest only for failure to pay minimum royalties during the particular two year period prior to the effective termination date.

(4) That the furnishing by the licensor of models and complete drawings of each of the patented articles were conditions precedent to the obligation to pay royalties.

(5) That the defendant as successor to the Alien Property Custodian and his predecessors did not by their acts or their letter of September 20, 1950, terminate Ketcham's rights under the agreement.

(6) That Ketcham is, and at all times since June 30, 1939, has been, the sole and exclusive licensee in the United States for the patents involved.

(7) That the defendant and all persons claiming by, through or under him or his predecessors in interest, are directed to recognize Ketcham as such sole and exclusive licensee.

The appellant now contends:

(1) That Ketcham failed to comply with Section 9(a) of the Trading With The Enemy Act, in that it did not file a claim for the return of vested property;

(2) The government did not vest any property or rights of Ketcham and that therefore the court below lacked jurisdiction to enter a judgment under the Trading With The Enemy Act;

(3) That the reliance by the court below on the Declaratory Judgment Act was improper;

(4) That the agreement provided for a division of markets which was a per se violation of the antitrust laws and that the agreement was therefore unenforcible.

## I.

*Notice under Section 9(a) of the Act.*

■ The filing of a notice of claim for the return of vested property under Section 9(a) of the Act is a condition precedent to maintaining the suit. 50 U.S.C.A.Appendix, § 9(a); Central Union Trust Co. of New York v. Garvan, 1921, 254 U.S. 554, 567–568, 41 S.Ct. 214, 65 L.Ed. 403; Panatech Corp. v. Carl Zeiss, Inc., D.C.S.D.N.Y.1953, 110 F.Supp. 664, 665.

Appellant contends such a claim was never filed. But the complaint alleges in Paragraph XII that Ketcham, on or about December 1, 1942, "presented a claim for its interest as herein alleged in the patents above referred to under The Trading With The Enemy Act, 50 U.S.C.A.Appendix, § 9 and § 32(a). That the claim was presented to the Alien Property Custodian on forms prescribed by said Alien Property Custodian." The answer denies the filing of a claim under Section 32(a) of the Act and admits the other allegations of Paragraph XII of the complaint. Thus, the government's pleading admits the filing of a claim under Section 9(a) of the Act.[5]

■ The Alien Property Custodian by press release dated February 23, 1943, announced that, "* * * An American licensee under a vested patent or patent application, need not file a

---

5. Both Section 9 and Section 32 of the Act refer to the filing of a claim. Section 9 concerns suits to recover property, while Section 32 concerns voluntary return of property by the Alien Property Custodian.

form APC–1 [6] to assert his claim to rights under his license." The government includes this press release as part of its showing on a motion for summary judgment. We can only conclude that either the notice required under Section 9(a) was given as admitted by the pleadings, or its equivalent, notice by form APC–2 was given as is shown clearly by the record, or that the notice was waived. In any event we find no merit to this contention by appellant.

## II.

*Vesting or seizure of Ketcham's rights.*

It is admitted that the Alien Property Custodian vested in the United States all the right and interest of Oscar Kind in the four patents and in the licensing agreement sued upon. But appellant contends the orders "did not vest and did not purport to vest" any rights of Ketcham.

It makes little difference what name or language is used. We inquire into what was done and the result accomplished. After the vesting orders, the Alien Property Custodian and his successor, the Attorney General, did the following things:

(1) Advised Ketcham that the licensing agreement was unenforcible because it violated the Sherman Act, [letter of 7/1/49];

(2) Advised Ketcham of its election and intention to terminate the agreement on December 31, 1950, pursuant to Paragraphs 15 and 16 of the agreement, but stating this was without prejudice to its position that the agreement was illegal, [letter of 9/20/50]; [7]

(3) Granted non-exclusive royalty-free licenses to the patents to various manufacturers for a nominal consideration.[8]

■ Neither the statements by the Alien Property Custodian (or his successor, the Attorney General) that he considered the licensing agreement illegal and unenforcible, nor his statement that he *intended* to terminate the agreement, would constitute a vesting.

■ Since the government stood in Kind's shoes after the vesting orders, it had all of Kind's rights. If *by the exercise of Kind's rights,* particularly the alleged right to terminate for failure to pay royalties, Ketcham's rights under the agreements were affected or became valueless, this was not a vesting of Ketcham's rights or a taking of them by the government. The granting of rights to others following a valid termination would not be wrongful and Ketcham could not complain. But the government's alleged right to terminate was determined adversely to it in the court below, and that determination is not contested in this appeal.

The government, contending the licensing agreement was illegal and unenforcible under the Sherman Act, granted licenses to others in derogation of Ketcham's exclusive right under the licensing agreement. This was an exercise of dominion, a taking, and had all the earmarks of a "vesting" unless the government had a right to do so, based on the ground that the licensing agreement was illegal.

It is argued that since the vesting order contains no language expressly indicating a vesting of Ketcham's rights, that regardless of the government's action, there had been no vesting. Section 9(a) of the Act describes property

---

6. APC–1 is the form provided by the Alien Property Custodian for notice under Section 9(a) of the Act, issued pursuant to General Order No. 4 [7 Fed.Reg. 5539.]

7. Termination was to be based on the ground that minimum royalties of $2000 per 2 years period were not paid. The trial court found payment of royalties was excused by failure of Kind to supply

the model automatic machine and the plans and specifications therefor. This holding by the trial court is not contested on the appeal.

8. Appellants concede that between July 1949 and September 20, 1950, the Attorney General issued three such licenses to others covering the patents in question.

"transferred * * * [or] delivered * * * to the Alien Property Custodian or seized by him hereunder and held by him * * *." Section 7(c) of the Act, provides that:

"The sole relief and remedy of any person having any claim to any money or other property heretofore or hereafter conveyed, transferred, assigned, delivered, or paid over to the Alien Property Custodian, or required so to be, or seized by him shall be that provided by the terms of this Act * * *."

 The Trading With The Enemy Act "would be of doubtful constitutionality if the remedy given were (sic) inadequate to secure to the nonenemy owner either the return of the property or compensation for it." Becker Steel Co. v. Cummings, 1935, 296 U.S. 74, at page 79, 56 S.Ct. 15, at page 18, 80 L.Ed. 54. To the same effect, Josephberg v. Markham, 2 Cir., 1945, 152 F.2d 644, 649.

Stoehr v. Wallace, 1921, 255 U.S. 239, stated at page 246, 41 S.Ct. 293, at page 296, 65 L.Ed. 604:

"Thus there is provision for the return of property mistakenly sequestered; and we have no hesitation in pronouncing it adequate, for it enables the claimant as of right, to obtain a full hearing on his claim in a court having power to enforce it if found meritorious."

"The existence of a right upon the part of claimant to regain his wrongfully seized property, and to do so completely, is essential to the constitutionality of the Act." Standard Oil Co. v. Markham, D.C.S.D.N.Y.1944, 57 F.Supp. 332, 334.[9] "* * * care must be taken to make secure to 'any person, not an enemy, or ally of enemy,' as such categories are specified in the Act, the right to reclaim his property or to have just 'compensation' for it * * *." Sar-

thou v. Clark, D.C.S.D.Cal.1948, 78 F. Supp. 139, 145.

"Section 9(a) must be broadly construed to give effect to its remedial purpose". Becker Steel Co. v. Cummings, supra, 296 U.S. at page 80, 56 S.Ct. at page 18; Standard Oil Co. v. Markham, supra, 57 F.Supp. at page 334.

In N. V. Montan Export-Metaal, etc., v. United States, 1952, 102 F.Supp. 1016, the court said at pages 1018–1019, 122 Ct.Cl. 42:

"That mistaken seizures would occur because of circumstances unknown to the Alien Property Custodian was apparent, and accordingly Congress provided in § 9(a) a remedy for just such occurrences. Congress had the right to prescribe, as it did in § 9(a), the sole manner in which mistakes could be corrected, and we therefore think that plaintiff must pursue the remedy provided."

The closest case we find is Leser v. McGranery, D.C.E.D.N.Y.1953, 112 F. Supp. 947. A beneficiary to insurance policies which had been vested was held to have stated a cause of action under Section 9(a) of the Act even though her right was a contractual one, and the Custodian did not have physical possession of the policies. Inherent in the decision but not discussed, is the fact that the vesting order did not purport to vest *her interest* as a beneficiary.

 Was there a seizure or a taking of appellee's rights under the licensing agreement? We judge this question, not alone by what was stated in the vesting order. After the vesting order was issued the government purported to exercise dominion over Ketcham's rights. The granting of licensing agreements to others, in derogation of Ketcham's exclusive licensing agreement was a vesting or a seizure under the Act unless the licensing agreement was illegal and unenforcible under the antitrust laws.

---

**9.** Here the court *entertained* a request for an injunction but denied it as unnecessary to protect plaintiff. The plaintiff claimed patents, and rights under patents and contracts which apparently had been vested.

### III.

*The Jurisdiction of the District Court.*

The government contends that the district court had no jurisdiction under the Trading With The Enemy Act to enter a declaratory judgment.

██ It is true that the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, is not a consent of the United States to be sued, and merely grants an additional remedy in cases where jurisdiction already exists in the court. Commercial Casualty Ins. Co. v. Fowles, 9 Cir. 1946, 154 F.2d 884, 165 A.L.R. 1068; Clark v. Memolo, 1949, 85 U.S.App.D.C. 65, 174 F.2d 978. Under Section 9(a) of the Trading With The Enemy Act, the "claimant may institute a suit in equity in * * * the district court of the United States for the district in which such claimant resides * * * to establish the interest, right, title, or debt so claimed * * *." Clearly, the court had jurisdiction of the parties and subject matter of the suit. Whether the court below correctly decided the case is not a jurisdictional question.

Furthermore, Ketcham's complaint sought an injunction to enjoin the proposed termination of the agreement and to enjoin granting of further licenses under the patent to strangers. The decree of the court, in addition to declaring certain rights of the parties, provided that the Attorney General [then the party to the action and the successor of the Alien Property Custodian] be "directed to recognize the plaintiff Ketcham Wire and Manufacturing Co., as such sole and exclusive licensee, with the rights above enumerated." This language of decree goes further than a mere declaration of rights and is in substance a mandatory injunction.

We have heretofore pointed out that constitutionality of the Trading With The Enemy Act requires that the remedy to the non-enemy property owner be broad enough to give him adequate relief. The relief he seeks depends upon whether the thing seized is for example, a chattel subject to actual delivery, or an intangible right where the remedy would consist of compelling an assignment of the same, or an adjudication that the plaintiff was the owner.

██ We hold that the power to grant judgment on behalf of a non-enemy property owner "establishing his right" is within the jurisdiction of a district court under the Trading With The Enemy Act.

### IV.

*The licensing agreement is not illegal or unenforcible under the antitrust laws.*

██ It is a fundamental rule of patent law that the owner of a patent may license another and prescribe territorial limitations. 35 U.S.Code, § 47 provided he may "grant and convey an exclusive right under his application for patent or patent to the whole or any specified part of the United States." Substantially similar language was carried over in to 35 U.S.Code, § 261 by the revision of the patent laws. Act of July 19, 1952, c. 950, § 1, 66 Stat. 810. These sections rest on the provisions of the Constitution in Art. 1, § 8, Clause 8. Patent laws therefore are equally as valid as antitrust laws.

The government cases are not in point in the case at bar.

██ It is clear that agreements to divide a market are violations of the antitrust laws. Addyston Pipe & Steel Co. v. U. S., 1899, 175 U.S. 211, 241, 20 S.Ct. 96, 44 L.Ed. 136; Continental Wall Paper Company v. Louis Voight & Sons Co., 1909, 212 U.S. 227, 261–263, 29 S. Ct. 280, 53 L.Ed. 486. But these cases do not concern the exercise of a patent monopoly.

██ U. S. v. Aluminum Co. of America, 2 Cir., 1945, 148 F.2d 416, was a case involving the monopolizing of a market but not by use of patents.

"It is not the monopoly of the patent that is invalid. It is the improper use of that monopoly." U. S. v. Line Material Co., 1948, 333 U.S. 287, 310, 68 S.Ct. 550, 562, 92 L.Ed. 701.

The courts have condemned many practices in connection with the use of patents, e. g.:

(a) *Use of invalid patents in price fixing:*

McGregor v. Westinghouse Electric & Mfg. Co., 1947, 329 U.S. 402, 407, 67 S. Ct. 421, 91 L.Ed. 380.

(b) *Cross-licensing of patents:*

U. S. v. Line Material Co., supra.

(c) *Attempts to extend the scope of patent monopoly:*

Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 516, 37 S.Ct. 416, 61 L.Ed. 871; Carbice Corp of America v. American Patents Development Corp., 1931, 283 U.S. 27, 31, 51 S.Ct. 334, 75 L.Ed. 819.

(d) *Illegal price fixing activities in connection with patents:*

Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 87 L.Ed. 165; Edward Katzinger Co. v. Chicago Metallic Mfg. Co., 1947, 329 U. S. 394, 67 S.Ct. 416, 91 L.Ed. 374; McGregor v. Westinghouse Electric & Mfg. Co., supra; Pfotzer v. Aqua Systems, Inc., 2 Cir., 1947, 162 F.2d 779, falls within this category. There was also involved the claim of royalties on unpatented articles.

(e) *Tieing patents to unpatented devices or processes:*

Ethyl Gasoline Corp. v. U. S., 1940, 309 U.S. 436, 456, 60 S.Ct. 618, 84 L.Ed. 852; Mercoid Corp. v. Mid-Continent Investment Co., 1944, 320 U.S. 661, 667–668, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 1944, 320 U.S. 680, 684, 64 S. Ct. 278, 88 L.Ed. 396.

(f) *Seeking to extend the effect of an expired patent:*

U. S. v. Timken Roller Bearing Co., D. C.Ohio, 1949, 83 F.Supp. 284, 313–314. Affirmed Timken Roller Bearing Co. v. U. S., 1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199.

(g) *Misuse of patents:*

U. S. v. National Lead Co., 1947, 332 U.S. 319, 67 S.Ct. 1634, 91 L.Ed. 2077; McCullough v. Kammerer Corp., 9 Cir., 1948, 166 F.2d 759.

The licensing agreement in our case does not come within the areas proscribed in the above cases relied on by the government.

Paragraph 12 of the licensing agreement heretofore set forth in this opinion, consists of two parts: First, "* * that you (Ketcham) will not sell or export the articles covered by the aforesaid patent and patent applications to any foreign country * * *". This was an agreement by Ketcham to honor the territorial limits of the license granted, and was lawful. The second part reads, "and that I, (Kind) will not import, nor permit the importation of said articles into the United States of America, its territories and possessions * * *". This was an agreement by Kind that the license granted Ketcham was an exclusive license. We cannot find anything illegal or unenforcible in paragraph 12. Exclusive territorial licenses granted under patents are old in the law. Unless they run afoul of the antitrust laws for other reasons, and based on additional facts as shown in the examples cited above, they are legal. U. S. v. General Electric Co., 1926, 272 U. S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362; Becton, Dickinson & Co. v. Eisele & Co., 6 Cir., 1936, 86 F.2d 267; certiorari denied 300 U.S. 667, 57 S.Ct. 509, 81 L.Ed. 874.

The basic holding in the General Electric case, supra, as to the right to a patent monopoly has not been questioned. That portion of the opinion involving price fixing, has resulted in discussion in subsequent opinions, e. g., U. S. v. Line Material Co., supra. But price fixing is not involved in our case.

Paragraph 14 of the licensing agreement, provides: "I, (Kind) undertake to give you (Ketcham) the first option on all and every new invention or improvement I shall make in future in the special Art of wire tieing tools and machines." At most Ketcham had an option which would permit him to bargain for the new patents. Unless Ketcham

met Kind's prices and terms as to royalty payment, the option would avail him nothing. This probably meant nothing more than that between equal bids for the new patents or device, Ketcham's bid would be favored.

We hold that the licensing agreement is not illegal or unenforcible. It follows that the appellant unlawfully exercised control and dominion over Ketcham's rights under the licensing agreement and that Ketcham was entitled to the relief granted by the trial court. The judgment is affirmed.