MANUFACTURERS TRUST COMPANY, individually and as Trustee for American Creditor Banks under German-American Standstill Agreements, French American Banking Corporation, Guaranty Trust Company, City Bank Farmers Trust Company and Bankers Trust Company, Plaintiffs,

v.

William P. ROGERS, Attorney General of the United States, Defendant.

United States District Court
S. D. New York.

Feb. 15, 1960.

White & Case for plaintiffs, A. Hayne deYampert, New York City, of counsel.

Dallas S. Townsend, Asst. Atty. Gen., Director, Office of Alien Property, S. Hazard Gillespie, Jr., U. S. Atty., Southern Dist. of New York, New York City, Irving Jaffe, Max Wilfand, Attys., Dept. of Justice, Washington, D. C., for defendant.

IRVING R. KAUFMAN, District Judge.

This is an action brought pursuant to Section 9(a) of the Trading with the Enemy Act [1] seeking the return in whole or in part of two accounts in the Manufacturers Trust Company (hereinafter the "Trust Company") aggregating $328,653.20 vested (i. e. seized) [2] by the Attorney General [3] in 1947 as property of an enemy, the German Reichsbank. [4] Plaintiffs are the Trust Company, individually and as trustees for certain "American Creditor Banks", and several of those banks individually.

Briefly stated, the complaint alleges that pursuant to regulations issued by the German Reichsbank under authority granted by an international credit agreement, the German-American Standstill Agreement of 1941, the Trust Company was named trustee of certain funds for the benefit of American Creditor Banks who were parties to that same agreement.

The complaint further alleges that since neither the Trust Company nor the American Creditor Banks are enemies or allies of enemies as defined in the Act, the Trust Company is entitled under section 9(a) to a return of the vested funds, so that it might administer the trust or might distribute it pro rata to the beneficiaries. The complaint also states a claim by the plaintiff banks in their individual capacities as beneficiaries of the alleged trust, the sum claimed in this count aggregating $172,884.25.

In substance, the answer denies that any of the plaintiffs ever acquired any rights to the vested property in any capacity under the above-mentioned standstill agreement or in any other manner.

On the basis of affidavits, briefs, exhibits and oral argument, both sides have moved for summary judgment.

## I. Background.

Beginning in the fall of 1930, Germany's foreign creditors began withdrawing the credits they had extended to German nationals. This activity constituted a serious drain on Germany's foreign exchange reserves and in order to combat the danger, the German Government instituted a system of foreign exchange controls administered by the German Reichsbank and the German Golddiskontbank. In a further attempt to prevent the complete collapse of German foreign trade, committees representing the two German banks and their foreign creditors met in Basle, Switzerland in 1931 to work out some arrangement for maintaining the volume of credits extended to Germany. Out of this

---

[1]. Oct. 6, 1917, c. 106, § 9, 40 Stat. 419, as amended, 50 U.S.C.A.Appendix, §§ 1–40. (Hereinafter "the Act").

Section 9(a) provides:

" * * * any person not an enemy or ally of enemy claiming any interest, right, or title in any money * * * seized * * * and held * * * by the Treasurer of the United States * * * may institute a suit * * * to establish the interest, right, title, * * * so claimed, and if so established the court shall order the * * * delivery to said claimant of the money * * * ".

[2]. Vesting Order 10261, dated November 26, 1947.

[3]. The authority and functions of the Alien Property Custodian were transferred to the Attorney General by Executive Order No. 9788, 50 U.S.C.A.Appendix, § 6 note, October 14, 1946, 11 Fed.Reg. 11981, 3 C.F.R.1946 Supp. 169.

[4]. See 50 U.S.C.A.Appendix, §§ 5(b) (1), 7(c) for the government's authority for the vesting.

conference came the German Credit Agreement of 1931. This agreement provided for a six-months' extension of German short-term indebtedness in the amounts and on the terms then existing. In consideration for such extension, interest payments on the indebtedness and payments to cover maturing drafts were excepted from Germany's foreign exchange controls. The creditors kept specified credit lines open and accepted payment on the debts in restricted use Reichsmarks which were deposited in accounts in the Reichsbank. These payments formed the creditors' "registered credit balances" and the creditors involved became "registered holders."

Because the international monetary situation did not improve significantly, and the German economy continued in a precarious state, the 1931 Agreement was extended by successive similar, but not identical, agreements until at least May 31, 1941.

II. The Origin of the "License Fees".

Beginning with the 1936 Agreement, registered holders were given the right to transfer their registered credit balances into "travel mark accounts", which could be used, in accordance with the provisions of the ruling agreement and regulations promulgated by the Reichsbank, by persons resident outside Germany for travel expenses while in Germany. Similarly, the later standstill agreements provided that the creditor banks could sell Reichsmarks from their registered credit balances for benevolent remittances to German nationals by persons outside Germany. This was advantageous to the registered holders because it enabled them, in effect, to sell some of their Reichsmark registered credit balances for their own currency.

It was out of these travel and benevolence transactions that the so-called "license fees" arose. These license fees formed the corpus of the two accounts vested by the Attorney General in 1947, the return of which is prayed in the instant action, and thus their nature and origin is of signal importance to this decision.

Every time an American registered holder transferred part of his registered balance into a travel mark account, he was required to pay into a special account in the Trust Company,[5] a certain amount of American dollars per 100 marks. A similar requirement attended the transfer of registered balances for benevolent remittances. For the period involved in the instant action, those fees were $4.50 per 100 marks for travel transactions and $3.35 per 100 marks for benevolent-remittance transactions. While these amounts were to be forwarded by the registered holder directly to the special accounts in the Trust Company, they were passed on to the ultimate purchasers of the marks as part of the "global price" paid. In other words, the registered holders were to collect the license fees from the holders of the travel mark accounts, who in turn, either personally or through agents, were to collect the license fees from the purchasers of the marks. (See Exhibit 5 to Wilfand affidavit.) In some situations the holder of the travel mark account or his agents could forward the license fees collected directly to the Trust Company, instead of forwarding it to the registered holder. (See Exhibits 35 & 37 to Wilfand affidavit.) The general procedure in regard to marks used for benevolent remittances was essentially similar.

Beginning with the 1937 agreement, the Reichsbank promised to make these license fee accounts available to creditors

5. There is some conflict in the affidavits as to what the correct title of those accounts should have been. The plaintiffs allege that they were properly labelled as trustee accounts, as per direction of the Reichsbank. The defendant alleges that the Trust Company mislabelled the accounts as trustee accounts, and that they were more properly custodial accounts maintained by the Reichsbank under its own control in the Trust Company. In the view I take of this action, as will be made clear below, the question of the name of the accounts as dictated by the Reichsbank is immaterial.

as sources of foreign exchange in their own currency. On certain specified dates, called apportionment dates, the parties to the relevant standstill agreements had apportioned to them by the Reichsbank that percentage of the accumulated license fees which bore the same relation to the total accumulated fees as that party's extension of credits to German debtors bore to the total credits extended. For instance, if an American creditor bank had extended 10% of all the credits extended to German debtors during a given standstill year, he would have apportioned to him 10% of all the accumulated license fees in the special account in the Trust Company. In order actually to receive his share of the license fees, however, the American creditor had to cause one of his German debtors to pay the equivalent amount in Reichsmarks into the Reichsbank.

### III. The Procedure of Contracting.

While each of the successive agreements was negotiated and signed by the German Reichsbank, the German Golddiskontbank, and committees representing foreign creditors, the committee representing the American creditors was not a legal entity and no indebtedness was owed to it. The sole function of the American committee was to negotiate the agreements and advise the American creditors of the action they should take. The American committee did not undertake to bind the American creditors, and indeed had no authority to do so. Rather, in order to become a party to any agreement and become bound to the duties and entitled to the benefits thereof, each individual creditor had to carry out a procedure called "adherence". Essentially, this process demanded that the individual creditors, within a specified time, notify their German debtors on a standard form letter of their willingness to adhere to the current agreement, specifying the credit lines with respect to which adherence was being effected. The German debtors, in turn, forwarded to their respective creditors a standard form letter confirming the adherence. Only then did the relevant agreement become effective as to any particular creditor.

### IV. The Vested License Fees.

With the above background set forth, it is possible meaningfully to discuss the specific property involved in this action. That property is composed entirely of license fees accumulated after May 31, 1941, the date the last agreement which had been adhered to by any American creditor expired. The transferors of marks for benevolence and travel continued to collect and remit the license fees to the Trust Company. They were able to do this because they still possessed registered credit balances and travel mark accounts even after the 1940 agreement expired. They apparently acted on the expectation that the 1941 agreement, at that time in the process of negotiation, would continue that requirement and apply to transactions after May 31, 1941.

By early June, 1941 that expectation of the parties seemed close to fruition. On June 10, 1941, the American committee cabled the text of the proposed 1941 agreement to the German committee. On June 14, 1941 the German committee cabled its approval of the proposed draft. On that same date financial transactions with Germany and its nationals were blocked by Executive Order No. 8389, 12 U.S.C.A. § 95a note. Efforts were made by the American committee to obtain a Treasury License to use blocked German funds to service the standstill debt, but such application was denied finally on August 11, 1941. At any rate, it is conceded by the plaintiffs that no American creditor ever adhered to the 1941 agreement.

### V. Discussion.

Almost all the evidence and argument presented on these motions has been directed to the status and provisions of the 1941 Standstill Agreement. The defendant argues that because of the failure of the American creditors to adhere to that agreement, it never came into effect, and the plaintiffs therefore could have obtained no rights in the vested

funds through its provisions. He argues further that even if the agreement did come into effect, the Trust Company was not constituted trustee of the vested fees thereby, but became merely an agent or depository for the Reichsbank. Thus, the defendant argues, the license fee accounts were property of an alien on the date they were vested.

The plaintiffs, on the other hand, argue that the 1941 agreement did come into effect, and that pursuant to that agreement the Trust Company was constituted trustee of a trust of which American creditor banks, including the other plaintiffs, were beneficiaries. Since neither the Trust Company nor any of the beneficiaries of the alleged trust were enemies or allies of enemies as defined in the Act, the plaintiffs argue that they are entitled to a return of the vested property under section 9(a).

In the view I take of the facts of this action it is unnecessary to decide what the respective rights of the parties in the vested funds would have been had the 1941 agreement come into effect. It is clear beyond peradventure from the undisputed facts that the agreement never did come into effect. Both sides to this action are in complete agreement that no American creditor ever adhered to the 1941 agreement and that the American Committee had neither the intent nor the power to bind any American creditor to it. The plaintiffs argue instead that the agreement became a binding contract (1) because adherence would have been effected had not United States Government regulations intervened and (2) because the 1940 agreement was continued as a contract implied in fact by the actions of the parties thereto in continuing to act under its terms.

█ As to the first of these arguments, it must initially be stated that the plaintiffs have not established that adherence was rendered impossible by government regulations. There is little doubt that monetary transactions pursuant to that agreement would have been unlawful under the government regulations, but there is no evidence that the mere act of adherence was rendered impossible. Even if that were the case, the result would not be different. It is meritless to argue that since a contract whereby certain funds could have been acquired was prevented by government activity, the acquisition of those funds must be considered as completed. To give weight to such an argument would allow other claimants under section 9(a) to argue that had not the Trading With the Enemy Act intervened, the enemy owner of funds would have transferred them to a non-enemy, and thus they are now the property of that non-enemy. In short, plaintiffs cannot claim that they had title to certain funds seized as property of an enemy because government regulations prevented them from entering a contract under which they might have been apportioned that money.

Nor is there any substantial merit in the plaintiffs' contention that the 1940 agreement was continued as a contract implied in fact. First, the conduct of the parties did not continue as it had under the 1940 agreement. For instance, no payments into the registered credit balances were made by German debtors, no credit lines were extended by the American creditors, and no apportionment was made by the Reichsbank. Furthermore, even if the conduct of the parties had continued substantially the same after the expiration of the 1940 agreement on May 31, 1941, no contract would therefore be implied. While it is often permissible to imply a contract when what is involved is a simple lease or a simple employment contract, one cannot as easily imply an intent to continue a detailed and complicated compact among international banks. It is especially difficult to imply such an intent in the context of this case. The history of these agreements discloses that formal extension was always the rule, even when the extension was for only a three month period. Furthermore, the successive agreements were rarely if ever merely continued, but were always modified in one or more substantial ways. Still further, while it might be barely possible

to find an intent in the two negotiating committees to continue the 1940 agreement, the committees were not the competent contracting parties, and it is impossible to imply an intent among all the creditors and all the debtors to continue the prior contract, with the same credit lines, the same methods of repayment, etc. In fact, it was undoubtedly the purpose of the complex adherence procedure to assure that each creditor and debtor would have control over the details of his own transaction.

However, the success the defendant has had in establishing that the 1941 Standstill Agreement never came into effect might well turn out to be a singularly pyrrhic victory. For, if it is clear that the plaintiffs could have acquired no interest in the vested license fees through the abortive 1941 agreement, it is equally clear that the Reichsbank could not have acquired any interest in those fees through that agreement either. With the failure of the 1941 agreement the Reichsbank lost all power legally to bind the creditors, be they registered holders or not. The entire license fee procedure was ruled by the successive agreements and it was in those agreements that the authority of the Reichsbank to control the disposition of those fees is to be found. (See, e. g. Standstill Agreement of 1940, clauses 4(10) (a) and 10(7).) And, even if the Reichsbank's power were not specifically delineated in the agreements, it would be unrealistic to find that its right to control credit transactions could outlive the last valid agreement. The successive agreements were at the heart of the complicated arrangements undertaken among the creditors, the debtors and the German banks to regulate the flow of international trade and credit. As has been pointed out above, the entire license-fee scheme was designed to allow creditors as creditors and not as currency salesmen to have an added inducement to keep credit lines open. It is unrealistic to urge that the Reichsbank could retain the right to manipulate these license fees while at the same time not being bound to the various duties prescribed in the successive agreements. True, the Reichsbank most likely had the factual power, on June 1, 1941, to control the registered credit balances even to the point of confiscation, and by the use of this power to coerce the continued collection of license fees. But that power must be distinguished from legal right, and it is only upon legal right that any claim of ownership of the vested funds can be based.

Thus, it is perfectly clear that the Reichsbank could have had no legal right, title or interest in any of the license fees collected after May 31, 1941, which are the only funds involved in the instant action.

The conclusion to be drawn from this fact, however, is not that the plaintiffs' motions must be granted. It is not sufficient for a claimant under section 9(a) to prove that the ownership upon which the government relied in seizing property under the Act was incorrect. He has the burden of establishing that he is not an enemy as defined in the Act, and that he has the requisite interest in the property to sustain his claim. See Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Brownell, 1958, 357 U.S. 197, 212, 78 S.Ct. 1087, 2 L.Ed.2d 1255; La Due & Co. v. Rogers, 7 Cir., 1958, 259 F.2d 905; Bosch v. Rogers, D.C.D.C. 1959, 169 F.Supp. 877. Furthermore, the claimant must show not only that he is not an "enemy", but that the beneficial owners of the property are not enemies. See La Due & Co. v. Rogers, supra; Cordero v. United States, D.C.S.D.N.Y.1953, 111 F.Supp. 556, affirmed per curiam, Cordero v. Brownell, 2 Cir., 1954, 211 F. 2d 90. Both these rules have a firm basis in logic and policy. If property was vested as belonging to enemy $A$, the government should not be required to return it upon application of enemy $B$, even if $B$ can establish that he owned the disputed property at the time of the vesting. Nor should a return of the property be ordered upon the application of $C$, claiming in a representative capacity, merely upon a showing that $A$ did not own the property at the time of vesting, and that $C$

was not an enemy. The correct rule is that the government may retain property vested as belonging to an enemy until the claimant establishes that he is not an enemy or claiming for an enemy.[6] Furthermore, it appears to be the salutary and general rule that the representative claimant must have been more than a mere depository of the vested funds at the moment of seizure in order to have standing to request their return. In fact, some courts appear to have gone even further, and have stated that no one other than the beneficial owners themselves have standing to claim under section 9(a). See La Due & Co. v. Rogers, supra. I believe such a rule to be too stringent, for one can think of many situations in which the logical and most efficient claimant would be a representative claimant. For instance, the trustee of an express trust or the executor of an estate, see Cordero v. Brownell, supra, should be entitled to recovery under section 9(a) if he can establish that none of the persons who would ultimately receive the benefit of the recovery was an enemy at the time the property was vested.

On the other hand, it is unwise to extend too broadly the rights of representative claimants, so as, for instance, to allow a mere depository to sue for the vested funds. Such a policy would encourage secondary proof of one of the key elements in the case, the enemy or non-enemy status of the ultimate beneficiaries. That is, it would lead to many actions where evidence of enemy status was put in evidence by others than those whose status was at issue. Furthermore, it would tend to put the control of any fund in question out of the hands of the federal courts, for once the fund was returned to the depository-claimant, the distribution of that fund would come under the control of other courts. It might appear to the federal court that no ultimate distributee was an enemy, but it would be difficult in many cases to as-

sure, by the federal decree, that such would be the ultimate distribution.

■ In the instant case the facts establish that the Trust Company was not constituted trustee of the vested accounts by the Reichsbank, nor did it become trustee in any other manner. Rather, those who collected the license fees forwarded them to the accounts in the Trust Company on the authority of, and for administration under, an agreement that was not then in existence and never came into existence. Thus, the Trust Company stood in relation to those fees as a mere depository or, at most, as a receiver of money paid by mistake. It stood, therefore, in relation to the owners of the fees as either a mere debtor or a constructive trustee. The distinction between the two statuses might be significant in certain circumstances, e. g., the bankruptcy of the bank, but for the purposes of this action the fact that the Trust Company was, at the time of vesting, merely in the position of one legally required to return money to the owners upon demand is dispositive. Such a status is clearly insufficient upon which to base a representative claim under section 9(a). Because of the vesting, the Trust Company is presently under no duty to return the funds to their true owners. Redress may be had by them, if at all, by a suit under section 9(a) against the Attorney General for return of wrongfully vested funds.

■ Therefore, summary judgment must be granted the government against the Manufacturers Trust Company in its representative capacity. The plaintiffs, however, have also sued in their individual capacities. But, they have measured their claims by what they would have been entitled to had the 1941 agreement come into effect and the apportionment pursuant to it taken place. Such a recovery, of course, may not be had. It is possible, though, that the plaintiffs as individuals may have been the owners of some part of the license fees vested.

6. Such a rule adequately protects the constitutional right of citizens not to have their property seized without due process of law. See Stoehr v. Wallace, 1921, 255 U.S. 239, 41 S.Ct. 293, 65 L.Ed. 604, affirming 2 Cir., 1920, 269 F. 827.

That would depend upon the contractual relationships among the four possible owners of those fees: the registered holders, the travel-mark-account holders, their respective agents and the ultimate purchasers of the travel and benevolence marks. Each one of these groups might have the paramount claim to these "mistakenly" collected funds. Evidence on that question, however, is almost entirely lacking from the papers submitted by both sides. Both sides have proceeded as if the question of right, title and interest in the vested funds depended solely on the provisions of the 1941 agreement and the regulations issued pursuant to it. Whatever evidence appears that applies to the question of ownership dehors that agreement, is tangential and inadequate.[7] Much more would have to be known about the mechanism of the license-fee collections and the relationships among the four groups taking part in them before a rational decision on the rights of these plaintiffs is made. In short, it appears that in view of my finding that the 1941 agreement never came into effect, certain facts have become material which were not material under the theory of the case espoused by both sides and the case cannot be disposed of finally, on these motions.

Under Rule 56(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., summary judgment " * * * shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact * * *." The courts are in entire agreement in holding that the party moving for summary judgment has the burden of showing the absence of any genuine issue of fact, and this burden must be met even if the burden of proof on the issue to which those facts apply is on the other party. See 6 Moore, Federal Practice, § 56.15 [3], and cases

there cited. On the facts of this case, though the plaintiffs have the burden of proving the non-enemy status of the beneficial owners of the vested property, the defendant nevertheless has the burden of showing that there is no genuine issue of fact between the parties as to the status and identity of those owners. Neither of these burdens has been sustained. Summary judgment is an extremely valuable technique for avoiding the wastefulness in time and money of a trial to determine facts not really in dispute. In the instant action, both sides have stipulated that there is no contested issue of material fact. But in circumstances like those presented in this case, wherein both sides were obviously unaware that certain facts were material, it would be unjust and indeed impossible, to decide the ultimate questions on the basis of scanty evidence tangentially presented. Cf. Colby v. Klune, 2 Cir., 1949, 178 F.2d 872; Arnstein v. Porter, 2 Cir., 1946, 154 F.2d 464, 470–75. It is more likely that a correct determination could be had after the parties have been allowed to address themselves to this new issue and present, if there is a dispute on the facts relating to the issue, at a trial, the evidence bearing upon its determination.

This does not mean that the present motions have been wasted effort on the part of the parties. As was contemplated by the framers of Rule 56, this decision, even though not dispositive, has served to narrow the issues that remain for determination. See Rule 56(d), Federal Rules of Civil Procedure; 6 Moore, Federal Practice § 56.20 [3]. It has been established by this decision that:

(1) The 1941 German-American Standstill Agreement never came into existence.

(2) The German Reichsbank had no right, title or interest in the vested funds

7. In Exhibits 35 and 37 to the Wilfand affidavit certain journal entries of the Trust Company are reproduced, and they indicate who the depositors to the special accounts were. But, it is clear from a study of those exhibits that most of the depositors were merely agents for the "owners" of the marks sold for benevolence or travel, and thus the ownership of the license fees cannot be determined merely from those exhibits.

at the date of vesting, either pursuant to that agreement or in any other manner.

(3) The Manufacturers Trust Company was not trustee of the vested funds either through the 1941 agreement or in any other manner.

Thus, a relatively narrow question remains for determination: if and to what extent the present plaintiffs in their individual capacities had an interest in the vested fees at the date of vesting.

Plaintiffs' motions for summary judgment are denied.

Defendant's motion for summary judgment is granted against the Manufacturers Trust Company as trustee.

Defendant's motion for summary judgment is denied against the plaintiffs in their individual capacities.

Settle order.