BECTON, DICKINSON & CO. v. EISELE
& CO.*
No. 7062.

Circuit Court of Appeals, Sixth Circuit.
Nov. 11, 1936.

A. H. Roberts, of Nashville, Tenn., and Hans v. Briesen, of New York City (Roberts & Roberts, of Nashville, Tenn., and Breed, Abbott & Morgan, Briesen & Schrenk, and Henry C. Quigley, Jr., all of New York City, on the brief), for appellant.

Allen S. Hubbard, of New York City (Trabue, Hume & Armistead, of Nashville, Tenn., Hughes, Schurman & Dwight, of New York City, and Charles C. Trabue, of Nashville, Tenn., on the brief), for appellee.

Before SIMONS and ALLEN, Circuit Judges, and FORD, District Judge.

SIMONS, Circuit Judge.

The appeal is from a judgment in an action for damages under the anti-trust laws (Sherman Act, July 2, 1890 [15 U.S. C.A. §§ 1-7, 15 note], Wilson Tariff Act,

*Writ of certiorari denied 57 S. Ct. 509, 81 L. Ed. ——.

August 27, 1894, 28 Stat. 509, as amended by act of February 12, 1913 [15 U.S. C.A. §§ 8, 11], and Clayton Act, October 15, 1914, 38 Stat. 730). The damages were assessed by a jury as flowing from execution and performance of a certain contract between the appellant and a foreign company by which the appellant obtained the exclusive right to sell in the United States products made abroad and not obtainable in the United States. The main defense was that the contract dealt with products imported into and sold in the United States under license from the owners of patents, and so, being in furtherance of a legal monopoly under the patent laws, did not offend against the anti-trust laws.

On February 25, 1927, Cottrell & Co., of London, England, agreed to supply the appellant and it alone (subject to certain exceptions) with its entire requirements for stainless steel hypodermic tubing, manufactured of an alloy protected by United States patents and sold under the vendor's trade mark as "Firth Brearley Stainless Steel." The circumstances leading up to the execution of the contract need to be narrated.

The American Stainless Steel Company of Pittsburgh is the owner of patents for an alloy producing so-called stainless steel, adjudicated as valid in American Stainless Steel Co. v. Ludlum Steel Co., 290 F. 103 (C.C.A. 2). It did not itself manufacture steel, but granted many nonexclusive licenses to concerns in the United States giving them the right to manufacture and to sell therein the steel covered by its patents. It also granted to others so-called import licenses for the importation into and sale of stainless steel in the United States. In addition it also granted to still others licenses, some exclusive and some nonexclusive, for the importation into and sale in the United States of specific articles of manufacture made of stainless steel as distinguished from the steel itself. On November 30, 1926, it granted to A. P. deSanno & Son of Philadelphia an exclusive license to import into and sell in the United States hypodermic needle tubing. deSanno contracted with Cottrell for exclusive importation into the United States of Firth Brearley tubing and canulæ.

The appellee, who had been in the business of manufacturing hypodermic needles out of carbon steel, became a customer of deSanno, purchased from it substantial quantities of stainless steel tubing, and claims to have built up a large and growing business in the sale of stainless steel hypodermic needles. The McGregor Instrument Company of Needham, Mass., and the Cook Laboratories of Chicago, were also customers of deSanno. Subsequently Cottrell & Co. repurchased its exclusive import agreement from deSanno for a consideration of 5,000 pounds, to be paid in tubing, deSanno surrendered its exclusive license agreement with the American Stainless Steel Company, and the latter granted a similar license to Cottrell. When deSanno surrendered its agreement to Cottrell it reserved the right to supply the patented product in the form of tubing and canulæ to the McGregor Instrument Company without limit, to the Cook Laboratories for a certain type of needle, and to Eisele & Co., the appellee, in a limited amount to cover its commitments from November, 1926, to June 30, 1927, but not thereafter.

Subsequently the contract here assailed was entered into. It recited the license from the American Stainless Steel Company to Cottrell, bound appellant to supply the full market demand in the United States for hypodermic needles made of the patented alloy, and granted the appellant the right to sell such needles throughout the Western Hemisphere. It bound Cottrell to supply the appellant's entire requirements for hypodermic tubing, and during its continuance, not to supply hypodermic needles, nor tubing nor canulæ for the manufacture of such needles, to any other person or concern in the Western Hemisphere except the McGregor Instrument Company, without limit, to Cook Laboratories for a specified type of needle, and to Eisele in the limited amount specified in the deSanno reservation. The contract was to continue during the life of the patents. There was no contract between the appellant and deSanno.

In the early part of 1927 Eisele was informed it could no longer depend upon continued supply of Firth Brearley tubing, as it was controlled by the appellant and McGregor interests, and it immediately sought other sources of supply. Eisele went wherever he thought there was a mill able to produce stainless steel tubing, including the American licensees of the Stainless Steel Company. While he did obtain a shipment from Bishop & Co. of Malvern, Pa., its tubing never had a temper hard enough to make a satisfactory needle. Finally he went abroad, but was

unable to obtain the tubing from Cottrell. He went to France and Germany, and interviewed manufacturers there with the same result. In December, 1929, shipments from deSanno ceased entirely. Whether he ever tried to get tubing from the appellant is not disclosed, although the latter had expressed a willingness to supply his company.

It is the plaintiff's contention that the contract between the appellant and Cottrell is in unreasonable restraint of trade, and that through it the appellant has an unlawful monopoly of the entire supply of stainless steel tubing and canulæ suitable for the fabrication of hypodermic needles in the United States; that the appellant's exclusive right to import and sell such tubing and canulæ offends against the anti-trust laws, and is not within the scope of any lawful monopoly possessed by Cottrell under its license from the American Stainless Steel Company, and so is not within legitimate patent rights legitimately exercised. It is urged that all that Cottrell obtained under its license was the right to exclude others from using and vending in the United States imported tubing or canulæ for the manufacture of hypodermic needles without its permission, and that beyond that any undertaking by which appellant bound Cottrell to refuse to sell its product to others in the United States was subject to the penalties of the anti-trust laws.

It has, of course, been said that the franchise which a patent grants consists altogether in the right to exclude. Bloomer v. McQuewan, 14 How. 539, 14 L.Ed. 532; United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L. Ed. 708, and cases therein cited. It has also been held that the monopoly granted by a patent does not extend to unpatented supplies with which it is used, or unpatented ingredients of which the patented articles are made. Carbice Corp. v. American Patent Corp., 283 U.S. 27, 51 S.Ct. 334, 235, 75 L.Ed. 819; Motion Pictures Patent Co. v. Universal Film Mfg. Co., 243 U.S. 502, 515, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959.

"If a monopoly could be so expanded, the owner of a patent for a product might conceivably monopolize the commerce in a large part of unpatented materials used in its manufacture." Carbice Corp. v. American Patent Corp., supra. We are not, however, here concerned with the attempted extension of patent monopoly over unpatented supplies or unpatented raw materials used in the fabrication of machines or articles covered by the patent, as in Oxford Varnish Corp. et. al. v. Ault & Wiborg Corp., 83 F.(2d) 764 (C.C.A. 6). The contract here assailed deals with the patented alloy itself when fabricated into specific articles of commerce imported into and sold in the United States.

In order to determine whether or not the present contract is within the scope of monopoly under the patent laws it is necessary to consider the external bounds of every patent grant. By it the patentee acquires the exclusive right to make, use, and vend the invention throughout the United States. This right he may assign to another and convey either in whole or in part, though any transfer short of an undivided share of his exclusive right, or his exclusive right within and through a specific part of the United States, is a license, giving the licensee no title in the patent itself. United States v. General Electric Co., 272 U.S. 476, 489, 490, 47 S.Ct. 192, 71 L.Ed. 362. In granting a license the patentee may limit the licensee's right to sell. He may grant a license to make and use the patented articles, but withhold the right to sell them. He may license one to make, another to vend, and still another to use, and he may confine each to a specified part of the United States. Manifestly his monopoly has no extraterritorial validity, but within the jurisdiction of the United States he has the exclusive authority to exclude or control the making of the patented articles, or the using and vending of them within the United States wheresoever they are made.

The patentee, or his assignees here, granted numerous nonexclusive licenses for the manufacture, sale, and use within the United States of the patented alloy. While these licenses are not in the record, it is the inescapable inference from the evidence, particularly from the testimony of Holding of the American Steel Company, and indeed is not disputed, that the right granted to licensees to vend in the United States was confined to such patented product, in whatever form fabricated, as was made in the United States, and as an incident to the right to make therein. This being so, there was still left to the owner of the patent a valuable part of the monopolistic field not pre-empted by virtue of any license to American manufacturers of steel. This was the right to use or vend

in the United States patented products elsewhere made, and this field the owner of the patent could further subdivide, granting to one a license to vend steel when made into one specific article of commerce and to another the right to use or vend other articles. . This it did. It granted to some the license to sell imported products of specified character made of the patented alloy. It granted to others the right to sell in the United States other products made of the patented alloy, and finally it granted to Cottrell the exclusive right to sell within the United States hypodermic tubing and canulæ imported into the United States from without, and in this respect it is immaterial what phraseology we use, whether we say affirmatively that the licensee had the right to sell certain imported articles made of the patented alloy, or say negatively that he had the right of immunity from claims of infringement and action for damages for selling such imported articles. In either case the licensee's rights arise from his occupation of a sector of the field of monopoly. Indeed his right to import and sell is but a concomitant part of his right to exclude others from doing so, while his obligation to import and sell arises from his royalty agreement, without which he would not have been chartered to exclude or command the exclusion of others.

■■ Confusion is perhaps imparted to the argument by the term "import licenses" used in the contract and employed by counsel. Strictly speaking, of course, there can be no such thing as an "import license." The monopoly granted by a patent includes the exclusive right "to make, use and vend the invention throughout the United States." The law does not undertake control of importations into the United States, and what the patent does not grant, of course, the patentee may not convey. Once imported, however, articles which respond to the patent claims become subject to the patentee's right to control or exclude their use or sale, and so what necessarily must be meant by an import license is nothing more nor less than the license to use or vend within the United States patented articles not made in the United States. This right being within the monopoly granted to the patentee, it could license Cottrell to occupy the whole or a portion of that part of its field of monopoly, and occupying it Cottrell could sell, if it chose, to one or to many. It could sell exclusively to the appellant, or it could sell to the appellant and to deSanno, and it could agree to limit its sales to both or to either of them.

■ Once having sold patented articles, neither the patentee nor its licensee may exercise future control over them. They pass beyond the scope of the patentee's monopoly. United States·v. General Electric Co., supra; Bloomer v. McQuewan, supra; Keeler v. Standard Folding Bed. Co., 157 U.S. 659, 15 S.Ct. 738, 39 L.Ed. 848. But there is here no control reserved by the contract or otherwise to Cottrell over its sales to the appellant. The appellant may do with its purchases whatever it sees fit, and may legally do. It may use all in its own factory, or it may sell to others; it may sell to Eisele and is bound by no undertaking to refrain from selling to Eisele. It is true that Cottrell made certain exceptions to its grant of exclusive rights to the appellant. It would continue to sell through deSanno to McGregor, to Cook Laboratories for a certain purpose, and to Eisele in pursuance of previous commitments. But the appellant had no contract with deSanno. Such reservations as were made by Cottrell were not in furtherance but in limitation of the exclusive rights it contracted to give the appellant. They were reservations made at the instance of deSanno for the protection of Eisele and others, and so not in furtherance but rather in limitation of any monopoly conferred upon the appellant.

■■ That the anti-trust laws do not embrace nor include contracts entered into in the legitimate exercise of rights conferred under the patent laws has been established in many cases. E. Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 755, 46 L.Ed. 1058; United States v. United Shoe Machinery Co., 247 U.S. 32, 38 S.Ct. 473, 62 L.Ed. 968; United States v. General Electric Co., supra; Virtue v. Creamery Package Co., 227 U.S. 8. 33 S. Ct. 202, 57 L.Ed. 393; Victor Talking Machine Co. v. The Fair, 123 F. 424 (C.C.A. 7); International Visible Systems v. Remington-Rand Inc., 65 F.(2d) 540 (C.C.A.6). It was said in the Bement Case, "The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the

contracts keep up the monopoly or fix prices does not render them illegal." There is nothing in this case to bring it within any recognized exception. We conclude that the contract between the appellant and Cottrell was within the scope of patent monopoly and rights legally conferred upon Cottrell by the owner of the patents, and so does not offend against the anti-trust laws. In view of this it becomes unnecessary to consider other questions raised by the briefs. The District Court should have granted the motion for a directed verdict. Its denial of it was error.

Judgment reversed, and cause remanded for further proceedings in conformity herewith.