SMITH INTERNATIONAL, INC., et al., Plaintiffs,

v.

KENNAMETAL, INC., Defendant.

No. C81–273.

United States District Court, N.D. Ohio, E.D.

July 9, 1985.

Daniel J. Sammon, Lowell L. Heinke, Watts, Hoffmann, Fisher & Heinke Co., L.P.A., Cleveland, Ohio, and John Kurucz, Kane, Dalismer, Kane, Sullivan & Kurucz, New York City, for plaintiffs.

Charles R. Rust, Elaine Harmon, Woodling, Krost & Rust, Cleveland, Ohio, Albert L. Jeffers and Robert G. Irish, Gust, Irish, Jeffers & Hoffman, Fort Wayne, Ind., for defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

This case involves a patent on a mining tool bit described and claimed by plaintiff Leroy E. Den Besten and James O'Connell in U.S. Patent Application Serial No. 944,011. O'Connell assigned his rights in the patent application to Mining Tools, Inc. (hereinafter "Mining Tools") in an agreement of April 3, 1979. Smith International, Inc. (hereinafter "Smith") subsequently acquired Mining Tools and became the successor of that agreement. On May 6, 1980, United States Letters Patent No. 4,201,421 issued on the above application. Subsequently, on December 4, 1980, plaintiffs Smith and Den Besten executed a License Agreement and an Industrial Dealer Agreement, appended as Exhibits One and Two, respectively, whereby plaintiff Den Besten granted Mining Tools, a division of Smith, an exclusive license under his one half interest in the invention to make, use, and sell mining tool bits covered by the patent, and in turn became the New England distributor for Mining Tools.

Plaintiffs brought the instant action against defendant Kennametal, Inc. (hereinafter "Kennametal"), a manufacturer of mining tools bits, for infringement of the patent in question. Defendant Kennametal counterclaims for, *inter alia*, violations of the federal antitrust laws. Both plaintiffs and defendant have moved for summary judgment on defendant's antitrust counterclaim, and have filed voluminous memoranda in support of their own motion and in opposition to the motion of their opponent(s). In relevant part, defendant's third counterclaim is based upon the following allegations:

On or about December 4, 1980, Plaintiffs Den Besten and Smith entered into an Agreement by which Plaintiff Den Besten granted Plaintiff Smith an exclusive license under U.S. Patent No. 4,201,421 for a royalty of one percent (1%); said Agreement granted Plaintiff Smith

the exclusive right to grant sublicenses under said patent.

On or about December 4, 1980, Plaintiffs Smith and Den Besten entered into an Industrial Dealer Agreement in accordance with which Smith granted to Den Besten the exclusive right to sell and distribute Mining Tool bits covered by Plaintiffs' U.S. Patent No. 4,201,421 in an exclusive territory including the entire states of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine and New York; said Industrial Dealer Agreement provided that in the event any other dealer sold such Mining Tool bits in said exclusive territory, Plaintiff Den Besten was to receive a commission of ten percent (10%) of the list price of such Mining Tool bits.

Defendant brings its third counterclaim against plaintiffs Smith and Den Besten under 15 U.S.C. §§ 15 and 26. In relevant part, defendant avers as follows.

This Counterclaim is brought against Plaintiffs ... to recover damages from Smith and Den Besten for injury to Kennametal's said business in the manufacture and sale in interstate commerce of mining tool bits, which injury proximately resulted from Smith's and Den Besten's violation of the Antitrust Laws of the United States, Section 1, Title 15, United States Code, and to restrain and enjoin Smith and Den Besten from continuing their illegal conspiracy and contracts in restraint of Kennametal's trade and commerce.

Plaintiffs Smith and Den Beston's [sic] said license Agreement and Industrial Dealer Agreement constitute illegal contracts and a conspiracy to divide markets and are in restraint of Defendant Kennametal's business of manufacturing and selling in interestate commerce mining tool bits of the type Plaintiffs allege infringe their U.S. Patent No. 4,201,421, in violation of Section 1, Title 15 United States Code.

By reason of the foregoing acts of Plaintiffs Smith and Den Besten, Defendant Kennametal has been damaged in its business and in the loss of profits in the sum of $1,200,000.

## I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S ANTITRUST COUNTERCLAIM

### A. *Positions of the Parties.*

Plaintiffs move the Court for partial summary judgment under Fed.R.Civ.P. 56 on defendant's third counterclaim on grounds that the License Agreement and the Industrial Dealer Agreement contain neither improper requirements or territorial restrictions. Plaintiffs further assert that in any event, defendant has no standing to sue since it has suffered no harm by the provisions of either agreement.

As to the requirements restriction, plaintiffs argue that requirements contracts are not illegal *per se*, but are subject to a "rule of reason." Plaintiffs argue that the restriction in paragraph three of the Industrial Dealer Agreement is limited to *patented* bits and that the restriction is therefore reasonable since it requires "the distributor to purchase his patented bits from the manufacturer holding the patented rights, for so long as the distributorship relationship remains in place." Plaintiffs argue that the provision prohibits the distributor from aiding and abetting infringers by inducing them to sell him infringing bits in violation of 35 U.S.C. § 271(b). Plaintiffs further state that defendant does not have standing to contest the requirements restriction where defendant has suffered no actual damage as a result of the provision, and is seeking to recover under 15 U.S.C. § 15 for future occurrences based upon present speculation.

Addressing the claimed territorial restrictions, plaintiffs argue that the 10% dealer's commission provided for in paragraph four of the Industrial Dealer Agreement, constitutes a pass-over fee which is not illegal *per se*, but must be analyzed under the facts of the case. Plaintiffs further argue that the defendant has no standing to contest the territorial restrictions where de-

fendant is not required to pay the 10% pass-over fee since it is not another dealer, and therefore has suffered no harm or disadvantage.

In their response in opposition, the defendant argues that plaintiffs, as competitors, have entered into horizontal agreements which impose territorial restraints on interstate commerce, and therefore, constitute "classical *per se* violation(s) of the Sherman Anti-trust Act," 15 U.S.C. § 1. Defendant claims that all parties distribute and sell construction cutting bits to the construction industry nationwide. Defendant argues that plaintiffs entered into their "twin Agreements" in settlement of a lawsuit brought by Den Besten in California against Smith and O'Connell for breach of contract under the '421 patent. Defendant states that in those Agreements "plaintiffs exchange[d] exclusive rights as co-owners of the non-exclusive rights provided by 35 U.S.C. § 263 for the '421 patent," and that the "exclusive license Agreement converted Smith to Den Besten's exclusive licensee and Den Besten to licensor." Defendant argues that under the exclusive license agreement, competitors like Kennametal and even Den Besten, co-owner of the patent, are excluded "from making, using or selling the wear sleeve bit." Defendant argues that the Industrial Dealer Agreement further favors plaintiffs "by restraining trade and suppressing competition."

Defendant argues that as the co-owner of patent, Smith had the right to manufacture, use, and sell the invention claimed in the patent, or license others to do so in return for a valuable consideration, although not exclusively, without accounting to Den Besten. Defendant argues that when Den Besten waived his right not to sue Smith in the December 4, 1980 exclusive license agreement, he waived a right which he technically did not possess, since "Smith, [as] co-owner [had] the right to exclude the rest of the world other than Den Besten from enjoyment of and dominion over the invention claimed in the '421 patent." Defendant argues that by means of the exclusive license Agreement, however, the "Plaintiffs contractually estab-

lished certain rights and a new relationship between themselves, i.e., Den Besten granted Smith exclusive license to make, use, and sell the patented invention in return for royalty (monetary consideration)," something which could not be done "[m]inus the mantle provided by plaintiffs' exclusive license Agreement."

Defendant argues that since Smith could not grant an exclusive territory to any dealer without Den Besten's exclusive license, "[p]laintiffs' Industrial Dealer Agreement ... must be viewed as a licensee imposing resale restrictions on a patented product." Defendant argues that the Industrial Dealer Agreement "is between competing co-owners of the '421 Patent technically dividing the interstate market of the wear sleeve bit and suppressing competition by injecting a mutually controlled arrangement in violation of the Sherman Act." Defendant argues that the 10% commission provision in the Industrial Dealer Agreement is an illegal pass-over fee where it is invoiced by Smith from amounts it owes the outside dealer. Defendant further argues that since the Industrial Dealer Agreement is at will, it is in violation of the seventeen year monopoly granted by the Patent Statute, 35 U.S.C. § 154, which provides for a seventeen year term.

As to plaintiffs' contentions that defendant does not have standing to sue under the Sherman Act, defendant points to evidence allegedly establishing the following:

a) J.J. Prizzi's March 11, 1980 inter-office memo (Exhibit S) indicating Den Besten's offer to sell wear sleeves to Kennametal at a substantially lower cost than offered by Smith (Smith's price to Kennametal was approximately 500% more than Den Besten's for the same product); and

b) Kennametal's ledger sheets (Exhibit T) showing Mining Tool Group sales by product for the years 1979, 1980 and 1981 showing 1979 and 1980 sales each in excess of $685,000 (cf. attached Kennametal invoices to Vermeer), and after

Plaintiffs' December 4, 1980, interlocking Agreements, a loss in 1981 of over $9,000 for the tool, "C1HD," ordered by Den Besten.

Defendant argues that this evidence explicitly establishes the harm caused it by plaintiffs' antitrust violations, and shows a distinct causal link between the two.

In a supplemental memorandum filed in support of their motion, plaintiffs sum up three grounds for bringing their motion. First, plaintiffs argue that defendant lacks standing to bring its third counterclaim since it has not suffered an antitrust injury redressable by the antitrust laws. Second, plaintiffs argue that the agreements involve "nothing more than a grant by Den Besten of all his rights as co-owner of the '421 patent, and an agreement by Smith giving Den Besten an exclusive license to sell in a specific territory." Plaintiffs argue that these agreements are not part of a patent licensing scheme offensive to the Sherman Act § 1, and are therefore sanctioned by 35 U.S.C. §§ 261 and 262. Third, plaintiffs argue that even if the '421 patent is not regarded as a justification for the alleged restraints, the agreements are not *per se* illegal, but rather, are subject to a rule of reason. Plaintiff argues that the application of the rule of reason has been extended by the Sixth Circuit to situations such as those in the case at bar where the plaintiff "Smith operates both as a manufacturer and as a dealer on the same market level as Den Besten." Plaintiffs argue that the restraints argued by defendant do not, under the circumstances of this case, always or almost always restrict competition.

The last exchange in this volley of pleadings is the final response filed by the defendant, in which defendant counters the three arguments raised by the plaintiff in its supplemental memorandum. In response to the lack of standing argument, defendant points to paragraph 17 in its third counterclaim in which defendant Kennametal makes a claim for damage to its business and lost profits in the sum of $1,200,000.00. Defendant argues that in this paragraph, it alleges the requisite proximate cause required under the provisions of 15 U.S.C. § 15, which states that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue...." Second, defendant argues that the plain meaning of the agreements between the plaintiffs, in light of the admitted commercial relationship between the plaintiffs Den Besten and Smith, establish a *per se* violation of § 1 of the Sherman Antitrust Act. Defendant argues that in this case, the plaintiffs did not experience any marketing problems, nor were there marketing differences between the plaintiffs and the defendant, which might justify the restrictions set forth in the plaintiffs' agreements. Further, defendant argues that in this case there was conspiracy and/or concerted action on the part of the plaintiffs, evidenced in the two legally binding agreements they executed.

## II. CROSS MOTION OF DEFENDANT, KENNAMETAL, INC., FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANT'S ANTITRUST COUNTERCLAIM

Defendant has filed a cross-motion for summary judgment on its third counterclaim. Both parties have advanced arguments on the merits of defendant's motion which mirror or are similar to arguments advanced as to plaintiffs' motion for summary judgment on the same counterclaim. For that reason, the following summary of the positions of the parties should be read with reference to the similar summary of the Court on the plaintiffs' motion for summary judgment on defendant's third counterclaim, above.

### A. *Position of the Parties.*

In support of its motion, defendant argues, as it did in opposition to plaintiffs' motion, that "[p]laintiffs' 'at will' Industrial Dealer Agreement terminates only upon written notice from either party, and has the potential to extend *ad infinitem* the competitive advantages obtained under

the '421 Patent which carries a seventeen-year government—approved limited monopoly."

Defendant argues that "[p]laintiffs negotiated a sweetheart deal comprising a territorially restrictive license arrangement. . . ." Defendant argues that the combined effect of the "exclusive license, protected exclusive territory, and requirements contract" provisions is to control methods of distribution *and* "squeeze out" defendant and other competitors, as a result of which the defendant has suffered considerable loss. Defendant argues that territorially restrictive license agreements between competitors are, without more, *per se* illegal horizontal restrictions. Specifically, defendant argues that paragraphs one, four and six of plaintiffs' Industrial Dealer Agreement provides for a "mutual realignment of territories enforced by a 10% commission 'penalty' on extra—territorial sales consummated," an unlawful horizontal restraint and a *per se* violation of the Sherman Act.

Plaintiffs oppose defendant's motion on three separate grounds, as follows. First, plaintiffs argue that defendant "lacks standing to bring its Third Counterclaim because the alleged restraint of its business of infringing plaintiffs' presumptively valid patent is not a redressable antitrust injury." Plaintiffs argue that defendant has alleged economic injury which is totally speculative. Plaintiffs argue that the interests defendant seeks to protect in its counterclaim are not protected under § 1 of the Sherman Act. Plaintiffs argue that defendant's claim that it is foreclosed from selling products covered by the '421 patent is really a claim for a right to infringe plaintiffs' patents, and that the antitrust laws do not protect patent infringers. Plaintiffs argue that "[s]ince defendant has no rights in the patented product, it cannot complain of being unable to compete for sales of the product either within or outside of Den Besten's territory."

Second, plaintiffs argue that their license and Industrial Dealer Agreements are sanctioned by 35 U.S.C. §§ 261 and 262, and that under § 262 one co-owner of a patent may grant the other an exclusive right to manufacture the patented invention. Plaintiffs argue that under 35 U.S.C. § 261, which allows a patentee or his assigns to grant and convey an exclusive right under the patent "to the whole or any specified part of the United States," paragraphs one and two of the Industrial Dealer Agreement legitimately permitted the owner to make a license grant of all substantial rights under the '421 patent to vend in a limited part of the United States. Plaintiffs cite case law to the Court for the proposition that a patentee or his assigns has the right to grant limited licenses. Plaintiffs argue that "Den Besten had the right to transfer all of his rights under the '421 patent to Smith," and "[t]he Industrial Dealer Agreement merely carved out of Smith's total bundle of exclusive rights a specific territory in which Den Besten was granted the right to sell the patented product."

Third, plaintiffs argue that their agreements, even if not expressly sanctioned by statute, are not singly or in combination *per se* illegal. Plaintiffs argue that a rule of reason should be extended to the case at bar. Plaintiffs argue that the alleged restrictions do not appear to always or almost always tend to restrict competition and decrease output. Plaintiffs argue that an examination of the purpose and effect of the vertical territorial restraint establishes that Smith's plan was to promote interbrand competition since the dominant company in the market was the defendant. Smith states that it felt that with an aggressive dealer in the New England states, like Den Besten, Smith could compete with Kennametal. Plaintiffs argue that when Smith gave Den Besten an exclusive sales territory, it did nothing to decrease competition.

As to the 10% commission provision, plaintiffs argue that the commission clause "is fair, reasonable, and not anti-competitive on its face." Plaintiffs assert that this provision protects the local distributor by preventing outside distributors from enter-

ing his market and capitalizing on good will that he has generated. Plaintiffs argue that not only does the provision allow other dealers to purchase nonexclusive licenses to sell in Den Besten's territory, but allows Den Besten to purchase nonexclusive license to sell outside of his designated territory. Plaintiffs argue that therefore the 10% commission provision promotes, versus prohibits, competition.

As to the requirements provision, plaintiffs state that the provision does not prevent Den Besten from buying unpatented products from other sources, including the defendant, but only limits Den Besten from purchasing his requirements of patented products from Smith. Plaintiffs state that the provision simply prohibits Den Besten from purchasing patented bits from illegal infringing sources, since Smith is the only authorized and legitimate manufacture of the patented bits. Plaintiffs state that the provision is not an antitrust violation since it does not appear, on its face, to foreclose or almost always foreclose legitimate competition.

As to the termination provisions of the Industrial Dealer Agreement, plaintiffs argue that the fact that the agreement is terminable at the will of either party is consistent with the rule of reason, which gives manufacturers a great deal of latitude in establishing their methods of distribution. Plaintiffs argue that upon expiration of the patent, Den Besten could purchase bits manufactured by third parties. Plaintiffs explain that upon the patent's expiration, Smith would cease paying license royalties, which would leave Den Besten without interest in doing further business with Smith. Plaintiffs argue that Den Besten could then purchase equivalent bits at lower prices from Smith's competitors. Plaintiffs argue that upon the patent's expiration, other competitors, including the defendant, would be free to enter the market for the sale of such bits.

Lastly, plaintiffs argue that the provision for the realignment of territories in the Industrial Dealer Agreement is lawful since the revision of designated territories is not controlled by Smith and Den Besten, but by Smith alone, pointing to paragraph six of the Industrial Dealer Agreement. Plaintiffs argue that the agreement simply permits Smith to "reasonably discuss" any revision with Den Besten.

Defendant has filed a reply to plaintiffs' memorandum in opposition to defendant's motion for partial summary judgment. Defendant argues that the first two grounds for plaintiffs' opposition that the defendant lacks standing, and that plaintiffs' Agreements are lawful under 35 U.S.C. §§ 261 and 262, were addressed in the Court's order of January 7, 1984. Defendant argues that the Court's order is *res judicata* to bar those issues. Defendant lastly replies to plaintiffs' arguments that their agreements are not *per se* illegal and must be tested under a traditional rule of reason. Defendant points to "inconsistent allegations, erroneous arguments and blatant misrepresentations," on the part of the plaintiffs to establish plaintiffs' lack of credibility in comparison to defendant's "uncontroverted evidence" (the exclusive license agreement, the Industrial Dealer Agreement, and the deposition testimonies of plaintiff Den Besten and Cletis Pinkerton). Defendant argues that plaintiffs lack of credibility negatively impacts upon their response, and renders it incredible.

As to the alleged *per se* violations in plaintiffs' agreements, defendant argues that plaintiffs' agreements are horizontal agreements which suppress competition, since Smith operates as a dealer on the same market level as Den Besten. Defendant argues that plaintiffs have engaged in a territorially restrictive license arrangement which has "no redeeming virtue other than to restrain trade" and is a classical *per se* violation of the Sherman Act. Defendant argues where "Smith is a dual distributor, i.e., both manufacturer and a distributor," plaintiffs' reliance on a rule of reason analysis is erroneous. Defendant argues that the purpose of the license agreement, the lawsuit between the plaintiffs via "admitted illegal protected exclusive territory received by Den Besten

through the ... facially restrictive terms of ... [the] Agreements," reveal that the restraints were imposed horizontally, are *per se* unlawful, and do not fall within an exception to the *per se* rule. Lastly, defendant argues that plaintiffs' agreements caused defendant damages by "squeezing them out" as one from a class of competitors. Defendant argues that but for plaintiffs' alleged violation of the Sherman Act via the December 4, 1980 Agreements, the "[d]efendant could continue to freely compete with Smith to supply Den Besten's requirements for cutting bits."

Plaintiffs reply to defendant's arguments stating that, if nothing more, defendant has simply raised issues of contract construction that can be decided only after full trial. As to plaintiffs' argument that the Court's order of January 17, 1984 is *res judicata* on the standing issue and on the applicability of 35 U.S.C. §§ 261 and 262, plaintiffs argue that "a denial of a motion under Fed.R.Civ.P. 12(b)(6) is interlocutory and does not have any res adjudicata effect." Plaintiffs argue that furthermore, the issues now before the Court were not addressed in that order.

Second, plaintiffs argue that Den Besten intended to and did transfer to Smith all of his rights under the '421 patent. Plaintiffs argue that "the assignment issue, [however,] has nothing to do with plaintiffs' position that the antitrust legality of the two agreements, if not sanctioned by sections 261 and 262, must be tested by the rule of reasons...."

Plaintiffs argue that because of the exclusive mining bit rights granted to Smith, Den Besten could not make, use, sell, or license the combination of Claims 1–15. Plaintiffs argue that Smith had rights under the entire patent and Den Besten had none, and that therefore, "the net effect of the O'Connell and Den Besten conveyances was to vest all rights in Smith on an exclusive basis." Plaintiffs argue that looking at the substance of the agreement, it is clear that the agreement is an assignment, not a license.

Third, plaintiffs argue that paragraph two of the agreement defines mining bits as the bits that were described and claimed in the patent application and the '421 patent as of the date of the agreement. Plaintiffs state that at the time the agreement was signed in late 1980, the '421 patent had been granted. Plaintiffs also state that the claims in the U.S. Patent application filed in 1978 were the exact claims that appear in the patent, and the fact that they were cancelled is not relevant.

Plaintiffs next argue that defendant does not have standing to pursue its counterclaim because of an alleged loss of infringing sales since that interest is not protected by the Sherman Act.

Lastly, plaintiffs argue that the provision for the payment of a 10% commission is not *per se* a violation of § 1 of the Sherman Act where Smith "never sought to prevent sales into and out of Den Besten's territory." Plaintiffs argue that "such sales have been made by Smith, Den Besten and others, and that the provision for payment of an [sic] 10% commission has not been in force."

The final pleading in this serial is the defendant's surreply to plaintiffs' brief, in which the defendant concedes that its use of the term *res judicata* as to the application of the Court's order of January 7, 1984, to certain issues raised by the motions before the Court was inappropriate. Defendant argues that the Court's order, however, "established the fact that 35 U.S.C. §§ 261 and 262 do not authorize agreements between co-owners of a patent which violate the antitrust laws."

## III. DISCUSSION AND LAW

Under § 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal...." In determining what combination of entrepreneurs actually serves to restrain trade, the United States Supreme Court in *U.S. v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515

(1972) held that a narrow reading of § 1 would permit any commercial contract to be deemed in violation of the Act, since "[t]heoretically, all manufacturers, distributors, merchants, sellers, and buyers could be considered as potential competitors of each other." *Id.* at 606, 92 S.Ct. at 1133. Therefore, the Court explained, a "rule of reason" analysis has evolved for determining whether or not business combinations or contracts violate the Sherman Act.

■ A classic definition of the rule was given in *Chicago Board of Trade v. U.S.*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), which held as follows:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and the its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relative facts.

*Id.* at 238, 38 S.Ct. at 244. A party arguing that particular restraints fail a rule of reason test must establish anti-competitive market effect, *see Davis-Watkins Co. v. Service Merchandise*, 686 F.2d 1190, 1202 (6th Cir.1982), *cert. denied sub nom* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984), and market power, since "[w]ithout market power, a firm cannot have an adverse effect on competition." *Id.*

However, notwithstanding the rule of reason, certain agreements and practices have been found to be so utterly devoid of redeeming value and/or harmful that they are regarded as *per se* illegal. In *Topco,* the Court gave a "classic example" of a *per se* violation of § 1 of the Sherman Act as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition," termed a horizontal restraint. *See Topco, supra,* 405 U.S. at 608, 92 S.Ct. at 1133. In contradistinction to horizontal restraints, the Court recognized vertical restraints, which it defined as "combinations of persons at different levels of the market structure," giving as an example, manufacturers and distributors. *Id.*

The Court's analysis in *Topco* was applied by the United States Court of Appeals for the Sixth Circuit in *Davis-Watkins Co. v. Service Merchandise, supra.* In that case, the Court held:

> To establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Id.* at 1195–1196, citing *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139, 147 (3rd Cir.1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). Acknowledging that while generally a rule of reason is used to determine whether market conduct is illegal under § 1 of the Sherman Act, the Court noted that an "illegal per se test" is used to analyze market conduct which is "manifestly anti-competitive." *Id.* at 1196. "Practices generally found to be illegal *per se,*" the Court found, "are group boycotts, price-fixing, horizontal market divisions and tying arrangements." *Id.*

Unilateral action within a specific market is not illegal under § 1, the Court stated, which requires proof of "concerted action." Furthermore, the Court wrote, "vertical" restraints "imposed by a manufacturer of a supplier upon its distributors or retailers ... are generally found to be potentially beneficial to interbrand competition." *Id.* Therefore, the Court stated, vertical restraints are analyzed under a rule of reason, citing *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549,

53 L.Ed.2d 568 (1977). However, "horizontal" agreements, "restrictive agreements among independent business entities at the same level of the market ... are found to have a pernicious effect upon competition and to lack redeeming virtue, so that analysis proceeds under a per se illegal rule," *id.,* citing *U.S. v. Topco, supra.*

The question, then, is whether the territorial and requirements restrictions of the two 1980 agreements were imposed within the distribution chain as vertical restraints between Smith as manufacturer and Den Besten as distributor, or whether the restrictions operated as horizontal restraints between Smith and Den Besten as distributors.

■ In answering a like question, the Court in *Davis-Watkins,* citing *Continental T.V., Inc., supra,* recognized a manufacturer's interest in maintaining intrabrand competition that is consistent with the efficient distribution of its products. The Court stated that "in determining whether non-price restraints are imposed vertically or horizontally—i.e., whether the non-price restraints should be analyzed under [the] rule of reason or as illegal per se—the focus of inquiry must be upon the effect and purpose of such restrictions." *Id.* at 1197. The Court then looked to *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) *cert. denied,* 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 *reh'g. denied,* 450 U.S. 1050, 101 S.Ct. 1772, 68 L.Ed.2d 247 (1981), for the following statement of when non-price restraints should be evaluated under a *per se* rule.

> [O]ur inquiry must focus on whether the effect and, here because it tends to show effect, see *United States v. United States Gypsum Co.,* 438 U.S. 422, 436 n. 13 [98 S.Ct. 2864, 2873 n. 13, 57 L.Ed.2d 854] (1978), the purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what

portion of the market, or instead one designed to "increase economic efficiency and render markets more, rather than less, competitive." *Id.,* at 441 n. 16 [98 S.Ct. at 2875 n. 16].

*Broadcast Music, Inc., supra,* at 19–20, 99 S.Ct. at 1562 [additional citations omitted]. The purpose of the non-price restraints may be determined by focusing upon their source and whether the restraints are consistent with the manufacturer's market strategy. *See Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404, 410–411 (6th Cir.1982).

In determining whether or not genuine issues of material fact remain for trial on defendant's third counterclaim, in order to resolve both plaintiffs' and defendant's motions, the Court, in reviewing the extensive pleadings filed by the parties, finds instructive the following statement of the Supreme Court in *Poller v. Columbia Broadcasting,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."

*Id.* at 473, 82 S.Ct. at 491 [footnote omitted]. Keeping this in mind, the Court proceeds with its analysis of whether genuine issues of material fact remain for trial on defendant's third counterclaim, and concludes that they do.

■ Initially, the Court finds that the allegedly illegal restrictions are not *per se* illegal horizontal restraints.

Under 35 U.S.C. § 261, patents are assigned the attributes of personal property. That section further provides that:

> Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing. The

89

applicant, patentee, or his assigns or legal representatives may in like manner grant and convey an exclusive right under his application for patent, or patents, to the whole or any specified part of the United States.

Further, under 35 U.S.C. § 262, "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use or sell the patented invention without the consent of and without accounting to the owners."

A patentee's right to license a patented device was recognized by the Court in *Rail-Trailer Co. v. ACF Industries, Inc.*, 358 F.2d 15 (7th Cir.1966), which stated:

[A] patentee may, without divesting himself of ownership of the patent, grant an exclusive license for the manufacture of the patented device, which license serves to exclude the patentee himself from engaging in the manufacture of the device, and which action, without more, does not constitute an illegal restraint of trade or violation of the anti-trust laws. This is so because the restraint arises from the patent grant and a lawful transfer of a part of the rights to which that grant attached. *United States v. General Electric Company*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 [ (1926) ]. *Bement & Sons v. National Harrow Company*, 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058 [ (1902) ]; *Brownell v. Ketcham Wire & Mfg. Co.*, 9 Cir., 211 F.2d 121, 129 [ (1954) ]. Second, Section 262 of the Patent Act (35 U.S.C.A. § 262) recognizes the right of joint owners of a patent to contractually modify their interests in the jointly-owned patent. It is only "[i]n the absence of any agreement to the contrary" that the section recognizes the independent right of each joint owner to "make, use or sell the patented invention without the consent of and without accounting to the other owners.

*Id.* at 16–17. *See also Becton, Dickinson & Co. v. Eisele & Co.*, 86 F.2d 267 (6th Cir.1936), *cert. denied*, 300 U.S. 667, 57 S.Ct. 509, 81 L.Ed. 874. (A patentee may grant a license of his interests in the patented device. "He may license one to make, another to vend, and still another to use." *Id.* at 269.)

As to the patentee's ability to grant a license limited to a specific geographic area, the Court in *Becton, supra*, expressly addressed that topic when it wrote that a patentee "may confine each [licensee] to a specified part of the United States." *Id. See also Brownell v. Ketcham Wire & Manufacturing Co.*, 211 F.2d 121 (9th Cir. 1954). ("It is a fundamental rule of patent law that the owner of a patent may license another and prescribe territorial limitations," citing 35 U.S.C. § 261. *Id.* at 128.)

Den Besten, as co-owner of the '421 patent, granted Smith, by way of the License Agreement, all of his rights to make, use, and sell the mining tool bits covered by the patent, a grant which Den Besten, as co-owner of the patent, was entitled to make. *See Rail-Trailer Co., supra.* Smith then possessed in total, one-half by assignment and one-half by license, the right to sell the patented invention to one exclusively, or to more than one, if it so chose. *See Becton, Dickinson & Co., supra*, at 270.[1] At that point, Smith was no longer operating on the same market level as Den Besten, since under the exclusive license Den Besten granted to Smith, the patentee was excluded from making, using, or selling the product. Defendant's argument that the agreements involved a dual distributorship is thus without merit. Smith acted within its rights as assignee and licensee by assigning to Den Besten an exclusive territory under 35 U.S.C. § 261 to sell and distribute the claimed mining tool bits, in consideration for which Den Besten agreed to purchase all such bits from Smith. No evidence establishes that Smith, as manufacturer, acted in a manner inconsistent with its market strategy, outside its economic

---

**1.** A "patentee [may] license [a licensee] to occupy the whole or a portion of ... its field of monopoly, and occupying it [the licensee] could sell, if it chose, to one or to many. It could sell exclusively to [one], or it could sell to [one] and to [another], and it could agree to limit its sales to both or to either of them."

interests. The arrangement was thus not one involving horizontal restraints originating from an agreement and/or concerted action between the parties as business entities operating on the same market level, was not, on its face, manifestly anti-competitive as an arrangement which would always, or almost always tend to restrict competition and decrease output, and therefore was not *per se* illegal.

■ Rather, the agreements involved vertical restraints between business entities at different levels of the market structure, i.e., Smith as manufacturer and Den Besten as distributor, and are subject to a rule of reason, pursuant to the authority cited *supra*. The application of that rule reveals genuine issues of material fact exist as to whether or not the plaintiffs acted in concert to exclude the defendant and/or other competitors, via restrictions in the plaintiffs' 1980 agreements, the market power of the plaintiff Smith, whether the conduct of the plaintiffs produced adverse, anti-competitive effects, and whether there was a causal relationship between the imposed restrictions and the damages allegedly suffered by the defendant. Specifically, genuine issues of material fact exist as to whether or not Den Besten's grant of a license to Smith to make, use, and sell the patented bits, together with Smith's grant of an exclusive territorial distributorship to Den Besten, enforced by the ten percent commission provision, in exchange for which Den Besten agreed to purchase his requirement of such bits from Smith, was a joint effort in restraint of trade, or was unilaterally designed and imposed by Smith to increase its economic efficiency in the New England territory and render that market more competitive.

## IV. CONCLUSION

For the reasons set forth above, genuine issues of material fact survive both the plaintiffs' and the defendant's motions for summary judgment on the defendant's antitrust counterclaim. Both motions are accordingly denied.

IT IS SO ORDERED.

## EXHIBIT 1

## AGREEMENT

This Agreement, is made and entered into this ____ day of _____, 1980, by and between LEROY E. DEN BESTEN, P.O. Box 344, Valatie, New York 12184 (hereinafter "DEN BESTEN") and MINING TOOLS, DIVISION OF SMITH INTERNATIONAL, INC., 7700 St. Clair Avenue, Mentor, Ohio 44060 (hereinafter "MINING TOOLS").

## WITNESSETH:

Whereas, each of the parties hereto acknowledge that DEN BESTEN and JAMES R. O'CONNELL (hereinafter "O'Connell") are joint inventors and co-owners of the invention described in and covered by the United States Letters Patent Application entitled MINING MACHINE BIT AND MOUNTING THEREFOR, Serial No. 944,-011, filed in the United States Patent and Trademark Office on September 20, 1978, now United States Letters Patent No. 4,201,421 issued May 6, 1980 (hereinafter "Said Patent").

Whereas, DEN BESTEN and O'CONNELL mutually agreed to license MINING TOOLS, and others at a royalty rate of two (2) percent with the proceeds of said royalty divided equally between DEN BESTEN and O'CONNELL by an agreement dated August 24, 1977, attached hereto as Exhibit A;

Whereas, it is the desire of the parties hereto that such agreement dated August 24, 1977 shall be cancelled in favor of the present Agreement;

Whereas, O'CONNELL assigned all his right, title and interest in said invention and agreement dated August 24, 1977 MINING TOOLS, by an agreement dated April 3, 1979. attached hereto as Exhibit B; and

Whereas, each party is desirous of freely licensing the aforementioned invention, application and/or United States Letters Patent issued thereon.

Now, Therefore, for and in consideration of the covenants herein recited the parties hereto hereby agree as follows:

1. Subject to the terms and conditions herein contained DEN BESTEN hereby grants to MINING TOOLS an exclusive, non-transferable right and license to manufacture, use and sell mining bits covered by any valid claim of Said Patent or reissues or continuations thereof. As defined herein, mining bits include only the bit and sleeve per se and not the wheel mounting block or socket for the bit.

2. This Agreement grants no rights, expressed or implied, to DEN BESTEN under any other MINING TOOLS patent unless otherwise licensed independently of this Agreement.

3. For the rights herein granted under paragraph 1 hereof, MINING TOOLS agrees to pay to DEN BESTEN an earned royalty of _____ on the net sales price for each mining bit made and sold in the past and future hereunder, by MINING TOOLS which, bit falls within the scope of any valid claim of the aforementioned Patent under 35 USC 271(A) (B) or (C), respectively. For the purposes of defining "net sales price" under this Agreement, said net sales price shall be MINING TOOLS actual billing price to the customer less any sales, use or excise taxes, discounts, or credit or bits returned or replaced without charge to the customer.

4. In the event of expiration of any patent forming the basis for royalty payment hereunder, or in the event any claim of any patent forming a basis for royalty payment hereunder is declared invalid by a Court of competent jurisdiction and the decision of such Court is not duly appealed or is not appealable, no royalty need be paid thereafter with respect to activity herein licensed which falls within the scope and jurisdiction of any claim of the expired patent or within the scope and jurisdiction of any claim so held invalid, unless such activity also falls within the scope and jurisdiction of any unexpired patent claim held to be valid or any expired patent claim not adjudicated.

5. MINING TOOLS agrees to provide to DEN BESTEN on the fifteenth (15th) day of January, April, July and October a statement of the net sales of mining bits hereunder made and sold during the preceding calendar quarter, and shall accompany any such statement with the payment of the royalties shown thereby to be due. DEN BESTEN, shall have the right during all reasonable business hours to examine the books of MINING TOOLS having to do with the sale of mining bits hereunder to the extent necessary to verify such statements and payments. Such examination shall be by a Certified Public Accountant only, accountable to MINING TOOLS, who shall not disclose to DEN BESTEN the details of any individual transactions excepting in the case of an ascertained breach of this Agreement.

6. In the event that the hereby involved Patent is infringed by a third party, MINING TOOLS will at its own expense, take steps which it, in its sole discretion, shall deem reasonable to terminate or abate such infringement but MINING TOOLS does not hereby obligate itself to any extent to bring suit or prosecute more than one such infringement at any one time. The parties shall share equally in the recovery from any such infringement action after MINING TOOLS is reimbursed for its costs and expenses.

7. MINING TOOLS shall defend at its own expense all infringement suits that may be brought against it on account of the manufacture, use, or sale of the licensed mining bit covered by this Agreement. If MINING TOOLS finds it necessary or desirable in any suit which it may institute or defend, MINING TOOLS may join DEN BESTEN in such action as may be necessary in its sole judgment to the litigation, and DEN BESTEN shall execute all papers necessary or desirable and DEN BESTEN shall testify in any suit whenever requested so to do by MINING TOOLS, however, at the expense, with respect to travel expenses and other such out-of-pocket expenses, of MINING TOOLS.

8. DEN BESTEN hereby warrants that he is not aware of any activity in respect to any offer for sale or sale of the mining bits licensed hereunder directly or indirectly by him that would impair the validity of any claim of Said Patent, and it is agreed that upon any breach of this provision DEN BESTEN shall forfeit any right to future royalties.

9. MINING TOOLS agrees to reimburse patent counsel for DEN BESTEN for one-half costs and expenses in prosecuting application Serial No. 944,011 including payment for the final Government fees in respect to issuing such application as United States Patent No. 4,201,421. MINING TOOLS shall have the right at its sole discretion to prepare and file any foreign counterpart applications based on Said Patent throughout the world and at its own expense. In such event, MINING TOOLS agrees to keep DEN BESTEN informed as to the filing and/or prosecution of any such foreign counterpart applications. DEN BESTEN agrees to cooperate and execute any and all documents necessary to preparing, filing and/or prosecuting any such foreign applications for patent.

10. MINING TOOLS shall have the right to cancel and terminate this Agreement upon the breach of the warranty of Paragraph 8. In the event of such cancellation, MINING TOOLS agrees to pay DEN BESTEN all the royalties due and payable up to the effective date of such cancellation and from such time on MINING TOOLS shall be in the same position which it would have occupied had this Agreement not been made and entered into.

11. This Agreement unless sooner terminated in accordance with its provisions, shall terminate upon the expiration date of Said Patent and MINING TOOLS shall be in the same position which it would have occupied with respect to the expired patent had this Agreement not been made and entered into.

12. This Agreement is personal and shall not be assigned without the express written consent of each of the parties hereto.

13. It is hereby understood and agreed by the parties hereto, that no confidential relationship is involved in respect to this license agreement, and the parties hereby agree to rely solely on the protection afforded by the licensed patent rights.

14. All mining bits manufactured by MINING TOOLS, or its sublicensees under this Agreement shall be marked with the patent number of Said Patent.

15. MINING TOOLS shall have the exclusive right in its sole discretion to grant sublicenses under this Agreement with both parties sharing equally in the royalty income of said sublicenses. In the event a sublicense is granted for consideration other than a royalty, the parties shall assess a value for such consideration on which a royalty would be based.

16. This Agreement shall bind and inure to the benefit of the parties, their successors in interest, heirs and assignees.

17. This agreement sets forth the entire agreement and understanding between the parties and merges all agreements and discussions prior hereto.

18. This Agreement shall be construed under the laws of Ohio.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed on the day and the date first above given.

/s/ Leroy E. DenBesten
Leroy E. DenBesten
MINING TOOLS
By /s/ H.D. St. Clair
H.D. St. Clair
Title GROUP OPERATOR, V.P.
SMITH INTERNATIONAL, INC.

STATE OF NEW YORK ⎫
COUNTY OF NEW YORK ⎬ ss.:

On this 2nd day of December, 1980 before me a Notary Public, personally appeared Leroy E. DenBesten to me known,

to be the individual named in and who executed the foregoing instrument, and he being by me first duly sworn, did acknowledge that he executed the same in his own

free act and deed and as and for the purposes therein set forth.

/s/ Concetta Siler
Notary Public

STATE OF ~~OHIO~~ CALIFORNIA
COUNTY OF ~~LAKE~~ ORANGE } ss.:

On this 4th day of December, 1980, before me personally came _____ to me known, who being by me duly sworn, did depose and say that he is the _____ of SMITH INTERNATIONAL, INC., the corporation described in and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said instrument is such corporate seal; and that he signed his name thereto by like order.

/s/ Vivian M. Clinc
Notary Public

EXHIBIT 2

INDUSTRIAL DEALER AGREEMENT

AGREEMENT, made and executed this ____ day of _____, 1980, by and between MINING TOOLS, DIVISION OF SMITH INTERNATIONAL, INC., of Mentor, Ohio (hereinafter referred to as COMPANY), and LEROY E. DEN BESTEN, of Valatie, New York (hereinafter referred to as DEALER), wherein the parties mutually agree as follows:

1. Subject to the terms and conditions contained herein, the COMPANY does hereby grant to DEALER the exclusive right to sell and distribute mining tool "bits" (as hereinafter defined) manufactured by the COMPANY in the exclusive territory including the entire states of Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine and New York.

2. As defined herein, mining tool bits means any such "bit" described and claimed in United States Patent Application Serial No. 944,011 filed September 20, 1978,

now United States Letters Patent No. 4,201,421 issued May 6, 1980.

3. In consideration of this agreement, DEALER agrees to purchase from the COMPANY all of his requirements of such "bits" so long as this agreement remains in force and effect.

4. No person other than the designated DEALER herein may sell or distribute such bits manufactured by the COMPANY in the aforementioned exclusive territory. However, another dealer outside of the aforementioned exclusive territory may buy bits from outside said territory and bring them into said territory for its own use. If potential sale of "bits" is contemplated or possible in said territory by another dealer other than said DEALER, these dealers are obligated to contact said DEALER to attempt a negotiated agreement. In the event that satisfactory agreements cannot be reached by the parties involved, the DEALER's sole and exclusive remedy against such other dealer shall consist of receiving a commission in the amount equal to ten percent (10%) of the list price of the "bit" as shown on the COMPANY'S price sheet for such "bit" from the dealer making the sale. In the event that another dealer of the COMPANY makes such sale and refuses to remit such commission to the DEALER, the DEALER shall notify in writing the COMPANY OF SUCH SALE AND REFUSAL. Upon such notification, the COMPANY shall invoice such commission to the DEALER making any future sale or deduct such commission from any amounts due from the COMPANY to such dealer and remit such commission to DEALER when collected. In the event that another dealer makes such sale in DEALER'S exclusive territory, DEALER shall have no remedy against the

COMPANY other than collection of the commission by the COMPANY as set forth above. In the event DEALER makes sales outside such territory, the DEALER shall pay the COMPANY the said ten percent commission.

5. Further, and pursuant to Paragraph 4 above, in the event that exclusive DEALER in those territory potential customer's principally reside, and exclusive DEALER chooses not to pursue actively potential customers work outside of said territory, for whatever reason, dealer in whose territory said potential customer may be working, and upon notice to exclusive DEALER of such situation, may actively attempt to sell customer without possibility of paying commission to exclusive DEALER. Customer in affect becomes "fair game" between exclusive DEALER and dealer in whose territory customer working for duration of particular work being performed.

6. Notwithstanding the COMPANY'S grant of an exclusive territory to DEALER as set forth herein, the COMPANY reserves the right to realign territories of the COMPANY'S dealers after reasonable discussion with the dealers involved and the exclusive DEALER herein.

7. The DEALER agrees to use due diligence and a reasonable business judgment to create a demand for and to promote the sale of such "bits", and to render prompt and satisfactory service to all purchasers thereof. In the event the COMPANY in writing requests the DEALER to promote sales and actively pursue potential customers outside the exclusive territory, the COMPANY shall reimburse the DEALER with respect to his travel expense and other out-of-pocket expenses.

8. Purchase of "bits" from the COMPANY by the DEALER shall be at prices determined by the average price of the preceding quarter or less if the price has gone down, and at terms and conditions set forth in COMPANY'S price list and other forms. This price will thus stand for three months. COMPANY reserves the right to change its products, prices, and terms and conditions of purchase. When a new price schedule issued by the COMPANY it shall automatically supersede all such prior schedules and the average price will be determined from these schedules. The DEALER agrees to maintain accurate records relating to the sale and inventory of all "bits" and to make such records available for inspection by an independent auditing firm at the request of the COMPANY or its representatives, during regular business hours on reasonable notice.

9. The COMPANY shall use due diligence to make deliveries with reasonable promptness in accordance with orders accepted from the DEALER. COMPANY shall not be liable for any damages for failure to fill orders or error or delay in deliveries. The COMPANY shall have the right to refuse any order if DEALER shall fail to meet payment schedules of COMPANY.

10. The terms of sale by the COMPANY are to be one-half percent (½%), ten days, net 30. Except when in COMPANY's opinion the financial circumstances are warranted, COMPANY may require cash upon delivery of any "bits" ordered by DEALER. All "bits" purchased under this Agreement by DEALER shall be F.O.B. at the COMPANY'S place of business, Mentor, Ohio.

11. The COMPANY'S "bits" are guaranteed against defects in workmanship and material. This guarantee does not apply to any "bit" which has been subjected to abnormal use, misuse, negligence or accident, nor does it cover labor charges to any other claim incident to the defect. Defective "bits" shall be held for inspection by the COMPANY representative who will authorize such disposition as is warranted. Final decision as to whether the "bit" is defective or not is to be made by the COMPANY, and the liability of the COMPANY is limited solely to replacement of the defective "bit". There are no other warranties, express or imply, except as stated herein. DEALER shall notify the COMPANY in writing at the end of each month as to any defective "bits", and shall promptly notify

COMPANY as to any complaints from customers with respect thereto.

12. DEALER shall at all times be deemed an independent contractor and it shall do nothing to create a principal-agent or employee-employer relationship. It shall have no authority to bind or obligate COMPANY in any what whatsoever, or to accept service of process in its behalf.

13. DEALER is authorized to use COMPANY trademarks and trade names in connection with the selling, promoting and advertising of the "bit" subject to written authorization of the COMPANY, but no use thereof shall give DEALER any interest in said trademarks and trade names. DEALER shall not use trademarks or trade names in any way which will infer or convey the impression that DEALER is an agent, employee, subsidiary or affiliate of COMPANY. The right to use said trademarks and trade names shall terminate upon termination of this Agreement.

14. No shipments will be made by the COMPANY without signed purchase orders. Signed purchase orders will be required to eliminate the possibility of errors in instructions. If an order is telephoned in for immediate shipment, the purchase order number must be given and a confirming order sent in the same day. No claims will be considered by COMPANY on shortages or incorrect shipments if they are filed more than ten (10) days after shipment is received. Each shipment should be checked upon its arrival for completeness and accuracy. Damage claims must be filed immediately with the freight company at the time the DEALER accepts delivery.

15. Either party may terminate this Agreement for any reason, by sending written notice of such termination to the other party ninety (90) days prior to the termination date. COMPANY may find it necessary to terminate the Agreement for the reasons, among other things, that DEALER is not meeting requirements as outlined previously bankruptcy or financial difficulty of DEALER, and declining and/or poor sales performance over a period of time. In such case, COMPANY will give DEALER a ninety (90) day notice allowing time for completion of customer transactions, for which "bits" will be provided. In this event, this Agreement is terminated for any reason whatsoever by either party, the DEALER shall have the right to seek and engage another manufacturer and/or supplier of said "bits" for the DEALER's use and/or sale only in said territory; and, under such circumstances, the COMPANY its successors and assigns shall not assert the aforementioned patent against such manufacturer, supplier and/or the DEALER.

16. This Agreement shall be deemed an Ohio Agreement and interpreted according to its laws. It shall inure to any successors of COMPANY by merger or otherwise and shall be assignable by COMPANY. It shall be assignable by DEALER only with written consent of COMPANY.

17. This document sets forth the entire Agreement between the parties and may be amended only by a writing signed by the parties Changes, addition, or erasures in this document shall be valid and binding only if initialed by both parties.

18. This Agreement shall be effective upon execution by an authorized representative of COMPANY after acceptance by the DEALER.

MINING TOOLS DIVISION OF
SMITH INTERNATIONAL INC.

By /s/ H.D. St. Clair
H.D. St. Clair

Date Dec. 4, 1980

By /s/ Leroy E. DenBesten
Leroy E. DenBesten

Date Dec. 4, 1980